AT THE

# NOVEMBER TERM, 1880.

| 35 | 585 |
| 55 | 561 |
| 35 | 585 |
| f78 | 228 |
| 82 | 101 |

---

## SWEENEY VS. THE STATE.

1. RECORDS: *Amendable after appeal or writ of error.*
   The record of the circuit court may be amended so as to make it speak the truth, in a criminal as well as in a civil case, after appeal or writ of error (the prisoner in a criminal case being brought into court), and the amended record brought up to this court by *certiorari.*

2. MURDER: *Malicious killing not necessarily murder in the first degree.*
   No killing is murder unless done with malice, and the statute having made two degrees of murder, it follows that a malicious killing is not necessarily murder in the first degree.

3. INSTRUCTIONS: *Should not be repeated.*
   It is needless for the court to multiply instructions by repeating in substance the same declaration of law.

4. MALICE: *When implied.*

.When it is shown that the killing was done with a deadly weapon, and no circumstances of mitigation, justification or excuse appear, the law implies malice.

5. JURY: *How judges of the law in criminal cases.*

It is the province of the court in all criminal cases to declare the law,.and of the jury to consider and weigh the facts in evidence, and to apply the law as given them by the court, to the facts, in making up their verdict, and in that sense they are judges of the law and the evidence.

ERROR to *Monroe* Circuit Court.

Hon. J. N. CYPERT, Circuit Judge.

*M. T. Sanders,* for plaintiff in error.

*Attorney General Henderson,* contra.

ENGLISH, C. J.    John Sweeny was indicted for murder in the circuit court of Phillips county, at the May term, 1879, and after he had been arraigned and pleaded not guilty, the venue, on his application, was changed to the circuit court of Monroe county.

He was tried in the latter court on the eighth of April, 1880, and the jury returned a verdict, which was recorded by the clerk, as follows: "We, the jury, find the defendant guilty as charged in the indictment."

He filed a motion for a new trial, which the court overruled, and after he had taken a bill of exceptions, he was sentenced to be hung on the fourteenth of May, 1880.

On the twenty-second of April, 1880, he sued out a writ of error, and, after its return, this court, upon inspection of the transcript, awarded a temporary supersedeas to suspend his execution, until the errors complained of could be heard and determined.

On a day of the September term, 1880, of the Monroe circuit court, the prisoner was brought into court, and the

attorney for the state filed a motion to amend the record in the matter of the verdict, so as to make it speak the truth, showing that at the trial on the eighth of April, 1880, the jury in fact returned into court, in writing, the following verdict:

" We, the jury, find the defendant guilty of murder in the first degree.

"(Signed,)          J. L. ROBERTSON, Foreman."

And that by an error of the clerk the verdict was recorded as above stated.

Both the prisoner and his counsel expressly waiving all further notice of the filing and prosecution of the motion, it was taken up and heard by the court, and upon the evidence produced, the court ordered the verdict as shown to have been actually returned by the jury, to be recorded by a *nunc pro tunc* entry, and it was so done.

It appears from a bill of exceptions taken by the prisoner, that on the hearing of the motion to amend the record, W. S. Dunlap, then, and when the case was tried, clerk of the court, testified that he was present when the jury returned into court their verdict in the case, which was indorsed on the transcript sent from the circuit court of Phillips county, on change of venue—and here the original verdict in writing was produced and shown to the court, in words following:

" We, the jury, find the defendant guilty of murder in the first degree.

"J. L. ROBERTSON, Foreman."

The witness further testified that the papers in the case had been in his custody from the time the verdict was returned to that day, and that the verdict had been in no respect altered or tampered with; that it was by his own clerical misprision in writing up the record of the proceed-

ings in the case at the last term that the record failed to
show the degree of murder of which the jury found de-
fendant guilty.

It was objected on the part of the prisoner that the
amendment of the record moved for could not be made
after the expiration of the term at which the verdict was
rendered, and after writ of error sued out and returned;
but the court overruled the objection, and upon the above
evidence, as stated in substance, ordered the amendment to
be made.

Afterwards, on suggestion of the attorney general, a *cer-
tiorari* was sent down, and a transcript of the record as
amended, embracing the proceedings on the motion to
amend, returned to this court.

1. RECORDS:
Amenda-
ble    after
appeal    or
writ of er-
ror.

I.   It is well settled in this court that the record of the
circuit court may be amended, so as to make it speak the
truth, in a criminal as well as in a civil case, after appeal
or writ of error, the prisoner in a criminal case being
brought into court, and the amended record brought up to
this court by *certiorari*.     *Freel v. The State*, *21 Ark., 213 ;
Binns v. The State*, *ante*.

II.   Sweeney was charged in the indictment with mur-
dering one W. A. Fisher, on the eighth of June, 1878, in
Phillips county, by cutting him with a knife, etc.

It was made ground of the motion for a new trial that
the verdict was not warranted by the evidence, which is
set out in detail in the bill of exceptions.

Mark Wiseman, a witness for the state, testified, in sub-
stance, that on the eighth of June, 1878, about half a mile
from Marvel, in Phillips county, when he was coming out
of a big gate on John Kendall's farm, on the public road,
he saw deceased, W. A. Fisher, and defendant, John Swee-
ney, riding side by side along the road.   Heard defendant

say to deceased, "You stole my wagon." Deceased made no reply that witness heard. In an instant defendant reached over towards deceased, and struck him a back-handed lick about the throat with a knife, reaching rather around and in front of deceased. Just as the blow was given, deceased fell or leaned forward, and dropped his hands on the shoulders of his mule. The mule began to caper, and defendant jumped off of his horse and started after deceased, cutting at him, and kept on after him until Mr. Macon stopped him. Defendant struck deceased just below the gate, and he fell just above and near the gate. Just after Mr. Macon stopped defendant from advancing on deceased, Jeff. Dean started towards defendant's horse to catch him, when defendant said to Dean, "Don't you touch my horse, or I will cut your damned throat." Dean got back, and defendant got on his horse and rode on up the road. At the time defendant struck deceased with the knife on the throat, he was doing nothing to defendant, nor making any demonstration that witness saw, but seemed to be trying to get out of defendant's way. Witness was in the gate, about twenty or thirty feet from them.

Willis Macon, witness for the state, testified that both defendant and W. A. Fisher lived on his farm at the time the latter was killed by the former. Witness overtook them going to Marvel together in the morning of the eighth of June, 1878, and they appeared friendly. On getting to town, defendant and witness "took a drink," and the three "took a drink" in the afternoon before they left town, deceased treating. Defendant had taken two drinks of whisky that afternoon that witness knew of, and may have taken more, but was not drunk at the time of killing Fisher. The three left for home together, and on the way, about half a mile from Marvel, when deceased and witness were riding

together, defendant approached them and said, "Are you talking secrets?" Deceased answered, "No. Which of us do you want to see?" Defendant replied, "You." Deceased then dropped back with defendant, and witness rode on ahead of them about forty or fifty yards, when he heard deceased make an exclamation, which sounded like he was hurt or surprised. Witness turned instantly around and looked back. He thought perhaps they were quarreling, and had heard that they had had a disagreement about a wagon. On looking back, he saw deceased fall forward on his mule, and rest both hands on its withers, and defendant striking at him. Deceased's mule then commenced backing and increasing its speed, until it got in about twenty or thirty feet of witness, when deceased raised his head slightly and said, "This fellow has cut me," rather halting on the last word. As he raised his head, witness saw the blood spurting from his neck. It spurted eight or ten feet, and in a circle as his mule turned. In a moment after witness saw the blood spurting, Fisher fell from his mule—a half slide and fall—and when he struck the ground, was apparently dead. Witness thought he was dead when he fell from his mule, but he lived not exceeding five minutes after he was cut. After witness saw defendant striking at deceased, defendant jumped from his horse and ran towards deceased, with a knife drawn in his hand (this was the first time witness saw the knife), and witness, putting his hand behind him as if he had a pistol, said to defendant to stop; and he stopped, and started off on the side of the road, slipping the knife through his fingers, as if wiping blood from it. Jeff. Dean then started to catch defendant's horse, and he told him not to touch his horse, or he would cut him. At the time witness heard the above exclamation, and looked back, Fisher was doing

nothing that he saw or heard but trying to get out of the way of defendant. Deceased was cut in the right side of the neck, the wound being an inch and three-quarters or two inches in length, and three-quarters of an inch in depth. There were two or three cuts in the clothing of deceased, appearing to have been made with a knife. The knife witness saw in defendant's hand was a common-sized twenty-five cents barlow, square-pointed, like a shoe-knife, and sharp to the point. He bought it in Marvel that afternoon. Showed it to witness before they left town, strapping it on his left leg, and remarking that it was good metal. Witness examined the person of deceased after he was dead. He had no weapon upon him. Nothing but a small pocket-knife, which was in his pocket shut up. Witness did not touch the body until Dr. Byrd came from Marvel, who examined the wound, opened it, and showed it to witness, who described it fully to the jury.

Dr. West, who was in court as a medical witness, and heard the testimony of Willis Macon, was of the opinion that the wound described by him was the immediate cause of the death of Fisher. "Such a wound," he said, "would necessarily sever the carotid artery and the jugular vein, from which death would necessarily result in all cases in from two to five minutes. The blood would not have spurted as witness described unless an artery had been severed. The knife described by witness would make such a wound.

Jeff. Dean, a witness for the state, testified that he left Marvel, in the afternoon of the eighth of June, 1878, and when about a half mile from the town, overtook defendant and deceased riding along together. Defendant was talking to deceased in a very insulting manner, about a wagon. Seemed to be threatening him. Witness rode on by them. Heard deceased make no response to defendant when he

passed them.  He rode on a short distance and caught up with Willis Macon, who was riding ahead of them, when he heard an exclamation from deceased, sounding as if he was surprised or hurt.  He looked around, and saw deceased fall or lean forward on his mule, etc.  He then proceeds to give about the same account of what occurred as that given by Macon.  He also stated that at the time he passed defendant and deceased, defendant appeared to have been drinking but was not drunk.

Other witnesses were examined by the state, whose testimony conduced to prove that defendant had some ill-feeling against deceased about a wagon, and had threatened him.

Some of the witnesses of the state, and two examined by defendant, testified that he and deceased appeared to be friendly before and on the day of the killing.

After a careful examination of all the testimony, we are of the opinion that there was evidence to warrant the verdict.

The killing, under the circumstances, appears to have been a wanton and unprovoked murder.

III.   It was made a further ground of a motion for a new trial that the court instructed the jury on the law of the case, but in what particular is not indicated in this assignment.

The bill of exceptions states that the court instructed the jury on the law by charging them upon the different grades of unlawful homicide under the statute, to which no exception was taken.  And charged them further by reading the following portion of the opinion of the supreme court, on *page 408, vol. 25, Ark. Rep.*:

" That in the sudden killing of a human being with a deadly weapon, without provocation, the law implies mal-

ice; and, to make the killing murder, it is not necessary that any particular animosity towards the deceased should exist; but a corrupt and wicked motive and intention to do evil, which results in the death of the deceased, is sufficient. Nor is it necessary that the intention to kill should have been formed or existed for any long length of time. If the intention to kill was formed or existed in the instant of the killing, it is murder."

Also, from the same opinion, on *page 409*, the following; substituting the words, "struck with a knife," in place of the words, "fired the gun:"

" If the jury believe, from the evidence, that the defendant, at the time he fired the gun, intended to kill the deceased, and did kill him, without any provocation, they will find him guilty of murder in the first degree."

To which defendant objected.

These instructions were given in the case of *McAdams v. The State*, and approved in the opinion of this court, from which they were read.

They were also in harmony with the opinion of this court, delivered by Justice Scott, in *Bivens v. The State, 11 Ark., 455*, in which the two degrees of murder, under the statute, were discussed.

IV. After the court had given its general charge to the jury (which was not objected to and not set out in the bill of exceptions), and had read to the jury, from an opinion of this court, the two instructions copied above, the counsel for the prisoner moved sixteen instructions, all of which the court gave except the third, fourth, seventh, ninth and fourteenth, and part of the twelfth.

When the court has given a general charge, and the prisoner seeks to reverse the judgment for refusal of instructions offered by him, the better practice is to set out the

38

general charge in the bill of exceptions, that this court may see whether the instructions refused were not embraced by the general charge, and, therefore, no substantial error committed, for the court is not bound to repeat the same charge in substance, though varied in terms, where the. refusal would work no injustice. *Stanton v. The State*, *13 Ark., 317*.

By statute, "all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, malicious and premeditated killing, or which shall be committed in 'the perpetration of, or in the attempt to perpetrate arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree." *Gantt's Digest*, secs. *1253–4*.

These statute provisions the court below doubtless gave in charge to the jury.

In *Bivens v. The State*, *11 Ark., 460*, Justice SCOTT, delivering the opinion, of this court, said :

" It is clear to our minds that when a given case of malicious homicide is not one of the cases specified in our statute, in the enumeration of the particular cases designated as of themselves murder in the first degree, then, in order to bring it under the general description, and thus to show it to be murder in the first degree, it is indispensable that the proof adduced shall be sufficient to satisfy the minds of the jury that the actual death of the party slain, was the ultimate result sought by the concurring will, deliberation, malice and premeditation of the party accused. The distinctive feature of this particular class of cases of murder in the first degree being a willful; deliberate, malicious and premeditated specific intention to take life. The inquiry, then, in cases of this class of murder in the first degree must always be, was the killing willful, delib-

erate, malicious and determined, on or before the act of killing? If it was, then that degree of malice has super-induced the act that is necessary to make it rank in the highest degree of murder."

" It is indispensable, then, in such cases, that the evidence should show that the killing with malice was preceded by a clearly formed design to kill—a clear intent to take life. It is not, however, indispensable that this premeditated design to kill should have existed in the mind of the slayer for any particular length of time before the killing. Premeditation has no definite legal limits, and, therefore, if the design to kill was but the conception of a moment, but was the result of deliberation and premeditation, reason being upon its throne, that is altogether sufficient; and it is only necessary that the premeditated intention to kill should have actually existed as a course determinately fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to afford time for reflection. Accordingly, it was held in Virginia (6 Randolph, 721) that when the accused, as he approached the deceased, and first came in view of him at a short distance, then formed the design to kill, and walked up with a quick step and killed him without provocation then or recently, so as to prevent time for reflection, it was murder in the first degree. Nor is it necessary to prove this formed design by positive evidence. Like any other fact, it may be established by circumstantial evidence, which, beyond a rational doubt, convinces the mind of the jury that this previous determination to kill did, in fact, exist. A homicide often fails to declare his intention, but remains mute as to this; and not unfrequently veils his fatal purpose under the guise of friendship. The most willful, de-

liberate, malicious and premeditated homicide would often go unpunished if his formed design to kill could not be proved by circumstances independent of any admissions of his, or even against his express declarations. The general rule of law, as to the point, is, that a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act. (*2 Stark. Ev.*, *738*.) Accordingly, if a man were to raise a gun, take aim and fire, and kill another, and these were all the facts proven, there could be no doubt but that he intended to kill; and this would be sufficient evidence to authorize the finding of that fact, and the law would intend that it was done with malice aforethought, and would be *prima facie* a case of willful, deliberate, malicious and premeditated killing, to be disproved or confirmed by the proof of the other attendant circumstances."

In giving most of the instructions moved for the prisoner, and in refusing the others, the purpose of the court below appears to have been to make its declarations of the law, upon the facts in evidence, conform to the principles announced in the opinion quoted from.

For the prisoner, the court instructed the jury:

"1. That, in order to convict of murder in the first degree, it must appear clear and conclusive, from the testimony, that the actual death of the party slain was sought by the concurring will, deliberation, malice and premeditation of the accused, and that the premeditation to kill existed as a course deliberately fixed upon before the act of killing, and was not formed by provocation received at the time of the act.

"2. If the evidence fails to satisfy the jury beyond a reasonable doubt that there was clearly formed a design to kill, or that the killing was done with deliberation and

malice aforethought, then the act of the defendant would be reduced to some other grade or character of homicide, which is committed without malice, and without deliberation or premeditation.

" 5.   If the design to kill be formed upon the sudden influence of passion, disconnected with any previous design to kill, though it may be executed willfully and maliciously, it will not constitute murder in the first degree.

" 6.   If the jury believe from the evidence that the assault which resulted in the death of the deceased, Fisher, was made by defendant with a pocket-knife, without deliberation and without a previously formed decision or settled purpose that his assault should produce death, they must acquit him of murder in the first degree."

The tenth and eleventh instructions given for the prisoner relate to the legal presumption of his innocence, and the duty of the state to prove all of the material allegations of the indictment.

(a).   The third instruction asked for the prisoner, and refused by the court, follows :

" The malicious killing of a human being is not *per se* murder in the first degree; it must also be willful, deliberate and premeditated, and although the jury may believe that the defendant struck the mortal blow under the impulse of a wicked or evil disposition, they could not find him guilty of murder in the first degree unless they further believe from the evidence that the act was deliberate and premeditated."

2. MURDER.
Malicious killing not necessarily murder in the first degree.

No killing is murder unless done with malice, and the statute having made two degrees of murder it follows that malicious killing is not necessarily murder in the first degree. (*Palmore v. State, 29 Ark., 250*).   But the court distinctly charged the jury in such of the instructions moved

by the prisoner as were given, that to constitute murder in the first degree the killing must be willful, deliberate, *malicious* and premeditated, which are the words used in the statute. It was needless for the court to multiply the instructions by repeating, in substance, the same declaration of law. *Stanton v. The State, sup.*

3. INSTRUC-
TIONS:
Not to be
repeated.

(*b*). The fourth instruction refused was in the words following:

" To constitute murder in the first degree, the design to kill must be formed willfully, that is, of purpose and with the intent that the act or stroke by which life is taken should have that effect; deliberately, that is, with cool purpose; maliciously, that is, with malice aforethought; and with premeditation, that is, the intent to kill, must be formed before the act by which the death is produced."

This instruction is in language used by Justice GREEN, in *Dale v. State, 9 Yerger, 551,* when defining the words of a Tennessee statute, similar to ours, and, after using the language copied in the instruction, he adds: " In other words, proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought"—citing *1 Leigh's Rep., 611.*

The court below did not think proper to adopt Justice GREEN's definitions of the words used in the statute, but in the instructions given the words of the statute, which are plain, were used in expressions which must have made their meaning, and the elements of the crime of murder in the first degree easily understood by a jury of ordinary intelligence.

The language employed in the instructions given, was as strong and clear as that used by Justice SCOTT, in *Bivens v. The State, sup.,* in defining murder in the first degree.

(c). The seventh instruction, which was refused by the court, is as follows:

"If the jury believe from the evidence that the defendant was on his part friendly with the deceased, Fisher, before and on the day up to the moment of the difficulty, this fact tends to rebut the existence of premeditated malice in the defendant."

There was no evidence upon which the jury could have founded a belief that the prisoner was friendly with the deceased up to the moment of the killing. On the contrary, it was proved by two uncontradicted witnesses that before he made the mortal cut with the knife, he was abusing and threatening deceased. There is an utter want of proof that deceased did or said anything at the time to provoke the prisoner to anger or violence.

Any declaration of law made by the court should be applicable to the facts of the case.

The seventh instruction, as framed, was properly refused.

(d). Passing over for the present the eighth, ninth and twelfth instructions, the fourteenth instruction, which the court refused, was in words following:

"If the jury believe from the evidence that the defendant was drinking on the day of the difficulty, and was, at the time of making the alleged assault, in such a state of mind, from the effects of the liquor drank, as to be incapable of cool reflection, or of forming a deliberate intent to kill and murder the deceased, they should acquit of murder, provided it appears that the liquor was drank out of social pleasure, and not with a wrongful intent."

This instruction would make intoxication an excuse for both degrees of murder. "Drunkenness (says Bishop) does not incapacitate one to commit either murder or manslaughter at the common law; because, to constitute

either, the specific intent to take life need not exist, but general malevolence is sufficient. But where murder is divided by statute into two degrees, and to constitute it in the first degree there must be the specific intent to take life, this specific intent does not in fact exist, and the murder is not in this degree, where one, not meaning to commit a homicide, becomes so drunk as to be incapable of intending to do it; and then, in this condition, kills a man. In such a case, the courts hold that the offense of murder is only in the second degree." *1 Bish. Cr. Law (6 ed.)*, *sec. 409.*

Both Macon and Dean, the only witnesses who testified that the prisoner had been drinking, swore that he was not drunk when he killed Fisher.

The fourteenth instruction was, therefore, not applicable to the facts in evidence, nor was it correctly framed as abstract law, and was properly refused by the court.

(*c*). The eighth instruction was as follows:

"Express malice is never inferred, alone, from the act done, or means used in doing it; it must be proved like any other fact in the case, by evidence sufficient to satisfy the jury of its existence."

This instruction was abstract. In this case the act done was the killing of Fisher, and the means or instrument used was a knife, but these two facts were not the only facts in evidence; the circumstances attending the killing, and the manner in which the knife was used, and the conduct of Fisher at the time and before the assault was made upon him, were proved by witnesses present, and there was some evidence of an old grudge on the part of the slayer.

"Express malice," as defined by the statute, "is that deliberate intention of mind unlawfully to take away the life

óf a human being, which is manifested by external circumstances capable of proof." *Gantt's Digest, sec. 1251.*

(*f*). The ninth instruction was that, "Malice is not implied by law from the fact that the killing was done with a deadly weapon."

It is not true, as a general proposition, that malice is not implied when the killing is done with a deadly weapon. *2 Bishop Cr. Law (6 ed.), sec. 680.*

" Malice shall be implied," says the statute, " when no considerable provocation appears, or when all the circumstances of the killing manifest an abandoned and wicked disposition." *Gantt's Digest, sec. 1251.*

When it is shown that the killing was done with a 4. MALICE: deadly weapon, and no circumstance of mitigation, justifi- implied. cation or excuse appear, the law implies malice. *Ib., sec. 1252.*

(*g*). The twelfth instruction, as asked, was as follows:

" It is the duty of the jury to apply the law to the testimony in order to determine the criminal intent with which the alleged assault or deed of the defendant was committed, and they must receive the law, when given, from the court, but in criminal cases where the issue involves a mixed question of law and fact, the jury are the judges of the law and the facts."

The court gave all of this instruction except the last 5. JURY: clause (from the words, " but in criminal," etc.), which judges of seems to imply that when the issue involves a mixed ques- the law. tion of law and fact, the jury are not to take the law as declared by the court, but may judge of both law and facts themselves ; and the clause being subject to such construction, it was properly refused. *Pleasant v. The State, 13 Ark., 360.*

It is the province of the court in all criminal cases to de-

clare the law, and, of the jury; to consider and weigh the facts in evidence, and to apply the law, as given them in charge, by the court, to the facts, in making up their verdict, and, in that sense, they are judges of the law and the evidence.

Upon the whole case, we are of opinion that the judgment of the court below should be affirmed.