REED *v.* STATE.

Opinion delivered March 4, 1912.

1. HOMICIDE—INSTRUCTIONS—WHEN HARMLESS.—The error of instructing the jury, in a murder case, that premeditation and deliberation are necessary in both degrees of murder was harmless where the jury were told that if the defendant at the time he fired the shot did not have the intention to take life he would be guilty of murder in the second degree, but that if he had the specific intent to kill, and the killing was done after premeditation and deliberation, he would be guilty of murder in the second degree. (Page 527.)

2. SAME—SANITY—EVIDENCE.—Where, in a prosecution for murder, the defense was that defendant was insane at the time the homicide was committed, a statement, made by him while he was incarcerated in jail after the killing, that he was going to play crazy and try to get bond was competent as tending to throw light upon his mental condition at the time the killing occurred. (Page 529.)

3. EVIDENCE—DECLARATIONS BY ACCUSED.—Statements or declarations by the accused not amounting to a confession, but from which, in connection with other evidence, an inference of guilt might be drawn, are admissible against the accused as admissions. (Page 530.)

4. NEW TRIAL—REMARK IN JUROR'S PRESENCE.—It was not an abuse of discretion to refuse a new trial on account of an improper remark made in the presence of a juror where there was evidence sufficient to justify a finding that the remark did not influence the juror. (Page 530.)

Appeal from St. Francis Circuit Court; *Hance N. Hutton,* Judge; affirmed.

STATEMENT BY THE COURT.

Andrew Reed was indicted, tried and convicted before a jury, of the crime of murder in the first degree, charged to have been committed, by shooting his wife, Mollie Reed. The defendant killed his wife on Monday the 12th day of June, 1911. The defendant and his wife were separated, and had been living apart for some time. On Saturday preceding the killing, the defendant went to where his wife was staying and

asked her to return to him. She refused to come, saying that he had treated her so badly she could not live with him any more. On the succeeding Monday she went to defendant's house and asked him if she might have a set of furniture, and he told her that she might have anything in the house she wanted. When she started to go, he told her to sit down, that he had something he wanted to talk over with her. A witness who heard this conversation said that he then left to go and get a bucket of water, and that the killing occurred while he was getting the water. The deceased was standing in the back part of the house with her hands on her hips at the time the defendant shot her. He shot her in the side with a shotgun; she fell head over heels down the steps into the yard. She struggled around trying to get up, and said, "Lord, have mercy!" The defendant walked back through the house with the gun in his hand, and went out on the back gallery, and, putting his foot on the step, shot her twice more. After he shot her the last time, one of the witnesses says he came back through the house, and his wife's mother asked if her child was dead, and the defendant said: "Yes, you ought to have been here and got your part." The deceased only lived about thirty minutes after she was shot. The homicide occurred in Madison, St. Francis County, Arkansas.

The defendant adduced testimony tending to show that he had a running sore in his head which had been caused by a lick which he had received several years before, and that it pained him considerably, especially in hot weather; that when he drank whisky it caused a loss of memory, and that he did not know or understand what he was doing. He also adduced testimony tending to show that he had been drinking heavily for several days prior to the killing, and that he was so drunk at the time he killed his wife that he did not know what he was doing.

In rebuttal, the State introduced witnesses who testified that they talked with the defendant a short time before and after the killing, that he appeared to be sober and understand what he was doing. Another witness went to see him after he was confined in jail and asked the defendant for some money that he owed him. The defendant told him that he was going to get out on bond, and the witness told him that was foolish-

ness to talk that way, that he could not get out on bond.   The defendant then said that he was going to play crazy and get out that way.

From the judgement of conviction the defendant has duly prosecuted an appeal.

*S. H. Mann,* for appellant.

1.   The testimony of Taylor Swift as to what defendant said about going to "play crazy" was incompetent and prejudicial.

2.   The court erred in its charge as to the degrees of murder.   21 Cyc. 727, 730, 1044; 7 L. R. A. 1071 (N. S.); 17 *Id.* 705; 11 Ark. 460; 9 A. & E. Enc. L. 567; 29 Ark. 264.

3.   A new trial should be granted for improper remarks made in the hearing of a juror.   73 Ark. 501; 75 *Id.* 67; 84 *Id.* 569; 40 *Id.* 454; 3 Wharton, Cr. Law, pr. 3172; 57 Ark. 1; 44 *Id.* 115; 34 *Id.* 341; 12 Cyc. 674 (4).

*Hal L. Norwood,* Attorney. General, and *Wm. H. Rector,* Assistant, for appellee.

1.   Swift's evidence was not prejudicial.

2.   The court's charge, as a whole, properly states the law, and could not have misled the jury.   34 Ark. 275; 49 *Id.* 156; 54 *Id.* 283; 91 *Id.* 503.

3.   The integrity of the verdict was not impeached.   No improper influence was shown by, nor did any prejudice result from, the remark heard by the juror.   84 Ark. 569; 73 *Id.* 581; 75 *Id.* 1.

HART, J., (after stating the facts).   The defense relied on by the defendant for an acquittal was his alleged insanity at the time of the killing, and this question was submitted to the jury under proper instructions given by the court.   The jury by its verdict found against the defendant on that issue.   If the defendant was capable of distinguishing between right and wrong when he killed his wife, there can be no doubt but that it was a wilful, deliberate and premeditated killing, and that he was guilty of murder in the first degree.

After the jury had deliberated for some time, they returned into court and asked for further instructions as to the distinction between murder in the first and second degrees. The court them gave them the following instructions:

"I have stated to you that the distinction between murder in the first and second degree is a very dim line. In order to convict the defendant of murder in the second degree, it must be clear to the jury from all the facts and circumstances in the case that at the time the fatal shot was fired there was an intent on the part of the defendant to take the life of the deceased. This premeditation and deliberation is necessary in both grades of murder, but in murder in the first degree it is not necessary to exist for any length of time, but it is sufficient if it was the intention of the party to take life. In murder in the second degree the distinguishing line would be if the party at the time he fired the shot did not have the intention to take life—that would be murder in the second degree, and if the intent was there a moment before the killing or the shot was fired, he would be guilty of murder in the first degree."

It is contended by counsel for defendant that this instruction does not properly state the law, and that the defendant was prejudiced by the court giving it. They insist that the instruction told the jury that there was practically no difference between murder in the first degree and murder in the second degree. The instruction is loosely drawn, and the court should have not told the jury that the distinction between murder in the first and second degrees is a very dim line; but we do not think the court's action was prejudicial to the rights of the defendant. All the instructions in the case are to be considered together. Under our statute, one of the main distinctions between murder in the first degree and murder in the second degree, is that to make out the crime of murder in the first degree a specific intent to take life must be shown. *Petty* v. *State,* 76 Ark. 515; *Byrd* v. *State, Ib.* 286. So that it will be seen that the leading characteristics of murder in the second degree are the presence of malice, distinguishing if from manslaughter, and the absence of premeditation or deliberation. In other instructions, the court told the jury what was necessary to constitute murder in the first degree, and instructed them fully as to the distinction between murder in the first degree and murder in the second degree. The law does not undertake to set any limit to the time which must elapse between the formation of an intent to kill and the consummation in the homicide. In the case of *Bivens* v. *State,* 11 Ark.

455, the court, in discussing what is necessary to constitute murder in the first degree, said:

"It is indispensable then in such cases that the evidence should show that the killing with malice was preceded by a clearly formed design to kill—a clear intent to take life. It is not, however, indispensable that this premeditated design to kill should have existed in the mind of the slayer for any particular length of time before the killing. Premeditation has no definite legal limits, and therefore if the design to kill was but the conception of a moment, but was the result of deliberation and premeditation, reason being upon its throne, that is altogether sufficient, and it is only necessary that the premeditated intention to kill should have actually existed as a cause determinedly fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to afford time for reflection."

From the principles above announced, it will be seen that the court erred in telling the jury that premeditation and deliberation are necessary in both degrees of murder, but this error was not prejudicial to the rights of the defendant. It will be noted that the court told the jury that the distinguishing line between the two degrees would be that, if the defendant at the time he fired the shot did not have the intention to take life, he would be guilty of murder in the second degree, but that if he had the specific intention to take life at the time he killed the deceased, and if the killing was done after premeditation and deliberation, he would be guilty of murder in the first degree. The jury found the defendant guilty of murder in the first degree, and necessarily found that the killing was done after premeditation and deliberation, and, so finding, the instruction was not prejudicial to the rights of the defendant. *Beene* v. *State,* 79 Ark. 460.

It is next insisted that the court erred in admitting the statement of the defendant, made while he was incarcerated in jail after the killing, that he was going to play crazy and try to get bond. The defense of the defendant was that he was insane at the time the homicide was committed. The question of his sanity or insanity at the time of the killing was one of fact for the jury to determine, and the statement was competent for whatever the jury might consider it to be worth,

as tending to shed light upon his mental condition at the time the killing occurred.

Statements or declarations by the accused before and after the commission of a crime, although not amounting to a confession, but from which, in connection with other evidence of surrounding circumstances, an inference of guilt might be drawn, are admissible against the defendant as admissions. 12 Cyc. 418.

Finally, it is contended by counsel for defendant that the court erred in refusing him a new trial because one of the jurors had been subjected to improper influences. On this question, the court heard the following evidence:

T. C. Merwin, testified: "I remember J. G. Taylor being in the office during the progress of the Andrew Reed trial. I asked something about what had been done in the case, what the jury was hung up about, and I don't remember right now, but something was said about the trouble being the instructions of the judge, and about that time Mr. Taylor got up and went out. I can't remember whether this was before the jury reported or not. I might have said something before Mr. Taylor went out about hanging the negro, but he was only there a few minutes the first time, and he went right out. After that I commenced talking about it."

J. G. Taylor: "I heard something said about hanging the defendant and why the jury were so long in returning a verdict as I was going in the vault for a drink of water, but I don't remember just what was said. The statement had no influence on me in my finding. I have not been influenced by anybody in any manner or way.

CROSS EXAMINATION.

"I did hear Mr. Merwin say something about Andrew Reed, but I got right up and went out. I stopped and told him that I was on the jury. (To the question, 'You understood he was condemning Andrew Reed, did you not?' objections sustained. Defendant expected). He said something to me effect that Reed ought to be hung. It was not long before I got away. I was going for some water any way."

John Wydick: "I was in Mr. Merwin's office at the time Mr. Taylor passed through there when the matter of

Andrew Reed was being discussed. To the best of my memory Mr. Taylor had passed into the vault when Mr. Merwin expressed himself about this case. I don't know how many times Mr. Taylor was in there; that the was only time that he said anything."

We have abstracted all of the testimony that was introduced on this question, and it will be seen that the court was fully advised concerning all the matters alleged as improper influences to which the jurror was subjected, and that it was made to appear to the satisfaction of the court that the juror was not influenced by what he heard Merwin say. The juror himself testified positively that the remarks made by Mr. Merwin in his presence did not have any influence upon him in arriving at a verdict. The witnesses on this point were examined in the presence of the court, and, the court having satisfied itself that the remarks made in the presence of the juror did not have any influence upon the mind of the juror in arriving at a verdict in the case, we do not think there was an abuse of discretion in denying the defendant's motion for a new trial in this account.

Judgment will be affirmed.