KING v. STATE.

Opinion delivered February 15, 1915.

1. HOMICIDE—FIRST AND SECOND DEGREE MURDER.—No killing is murder unless it is done with malice, and the statute having made two degrees of murder, it follows that malicious killing is not necessarily murder in the first degree; it must also be wilful, deliberate

and premeditated, or committed in the attempt to commit some one of the felonies mentioned in the statute.

2. HOMICIDE—SECOND DEGREE MURDER.—Under the statute all homicides, which were murder at common law, except where the killing is with malice, and was preceded by a clearly formed design to kill, or a clear intent to take life, are now murder in the second degree.

3. HOMICIDE—FIRST DEGREE MURDER—ISSUE UNDER THE FACTS—INSTRUCTIONS.—In a trial for homicide, if there is no evidence whatever tending to establish a lower degree of homicide than murder in the first degree, it is the jury's duty to take the court's exposition of the law, and the court should decline to give the jury instructions as to any lower grade of homicide.

4. HOMICIDE—SECOND DEGREE MURDER—ISSUE UNDER THE FACTS—INSTRUCTIONS.—In a prosecution for homicide, if there is any testimony from which the jury might legitimately infer that the defendant was guilty of a lower grade of homicide than murder in the first degree, it will be the duty of the court to instruct the jury on that degree of the offense.

5. HOMICIDE—CONFESSION—EXPLANATION—OTHER EVIDENCE.—In a prosecution for homicide, where the admissions of the defendant in the nature of a confession are allowed in evidence against him, all that he said in that connection must also be permitted to go before the jury. Whatever explanation the defendant may make in regard to the killing, or in regard to the circumstances attending it, are to be admitted in evidence just as much as the admission of the killing itself, and when such is not done, and the jury properly instructed on the degrees of murder, a judgment of murder in the first degree will be reversed.

6. CRIMINAL LAW—LESSER CRIME—REVERSAL OF JUDGMENT.—Where the jury, in a prosecution for homicide, were not properly instructed on the law, relative to the degrees of murder, and convicted the defendant of murder in the first degree, the cause will be reversed, but where the facts are sufficient to warrant a conviction of second degree murder, the Supreme Court on appeal will order the Attorney General to elect if he will have the defendant sentenced for murder in the second degree.

Appeal from Mississippi Circuit Court, Osceola District; *W. J. Driver*, Judge; reversed.

*J. N. Thomason* and *S. L. Gladish*, for appellant.

There was evidence which, if believed by the jury, would have warranted a verdict of a lower degree than murder in the first degree, and the court erred in failing to instruct the jury as to murder in the second degree. Where there is the slightest evidence to warrant an instruction of this nature, it is error to refuse to give it.

102 Ark. 186; 91 Ark. 575; 74 Ark. 265; *Id.* 451; 43 Ark. 289; 109 Ark. 517; 162 U. S. 313; *Id.* 466.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

The evidence is fully sufficient to show that all the elements of murder in the first degree exist in this case, and the failure to instruct as to murder in the second degree was not reversible error. 50 Ark. 506.

HART, J. Rice King prosecutes this appeal to reverse a judgment of conviction against him for murder in the first degree, charged to have been committed by shooting Mary Jones with a pistol. The facts as shown by the State are substantially as follows:

Tom Jones and Mary Jones, his wife, both colored, lived on the farm of H. E. Bowen in Mississippi County. Rice King, also colored, lived in the same neighborhood. On one Tuesday morning in June, 1914, Tom Jones arose early in the morning and discovered that his gate had been left open, and that his hogs and cows had got out. He went in one direction in search of them and directed his two little boys to go in another. Tom Jones, Jr., testified, that Rice King came around from the corner of the barn which was about two hundred feet north of the house, just after his father left, and drew a pistol on Mary Jones, who was at the time out in the yard getting wood. He said that he was just going out of the gate when he saw Rice King draw the pistol; that he then came back to the house, and that Rice King then drew the pistol on him; that he went into the house and got a .22 calibre rifle and pointed it at Rice King, and the latter then went away; that when Rice King drew the pistol on his mother, she threatened to tell his father, and that King said, "Damn Mr Jones and you, too;" that after Rice King went away he went on after the cows and brought them home, and that when he returned, his mother was not about the house anywhere, and that when his father came in he told him what had happened and about his mother being missing.

Tom Jones, Sr., testified that when his son told him about seeing Rice King around the barn earlier in the morning, he went out there and saw where the weeds had been pushed down as if a scuffle had taken place, and said that there was some blood on the weeds. He then went and told H. E. Bowen, the son of his landlord, about the matter. Bowen came back with him and examined the place back of the barn where the weeds were crushed down, and said that he discovered blood on them. Bowen and Jones then followed a trail which led from there toward the levee and toward a thicket. The dew was yet on the grass, and at intervals along the trail, which had grown up with weeds, they could see the weeds crushed over as if some heavy body had been laid there. They also discovered at times some blood on the weeds. They followed the trail an eighth or a quarter of a mile, and found the body of Mary Jones lying in the edge of the thicket, dead. She had been shot through the breast and had bled internally. There was no evidence of much blood on her body, and, according to the evidence of other witnesses for the State, there were no marks or powder burns on her breast where the bullet entered. She was a brown colored negro woman, and the evidence shows that powder burns would not show on her to the same extent that they would on a white object.

Other evidence for the State tends to show that Rice King had been having sexual intercourse with the deceased for some time, and that he had been warned by the deceased's husband to keep away from his place.

One witness for the State testified that on the Sunday preceding the killing, the defendant, pointing to Mary Jones, told him that his "kidding" woman was about to quit him, and that he was not going to stand for it. This conversation occurred at a church in the neighborhood.

Another witness testified that when the services were ended on that particular day Rice King came up where Mary Jones was, and began "jarring" with her; that she told him to let her alone; that he told her he would

"get her;" and that on the following Tuesday he heard of Mary Jones's death.

Other evidence for the State tends to show that on the morning after the killing, the defendant put on a clean shirt and overalls, ran away, and was not captured for several weeks.

One witness stated that he met him on the afternoon of the killing riding a mule, and that he told him how the killing occurred; that he said he and the deceased were playing, and that he was trying to get his gun from her, that she pointed it at him, and told him to get back, that he knocked the gun up, and it went off and shot her. On cross-examination he said that Rice King told him that he was scuffling and trying to get the pistol from Mary Jones, that she told him to get back off her, "kind of bluffing," and drew the pistol on him, that the pistol was cocked, and he was afraid she would shoot him, and he knocked it up and it went off and shot her.

The record shows that when the defendant was first put on trial for this crime, the trial resulted in a hung jury, but that at the same term of the court and the next week after the first trial, the trial was had from which this appeal is taken.

Rice King testified at the first trial, and a member of the petit jury at that trial said that Rice King testified that the killing did not occur at the barn, but that it took place three or four hundred yards from there; that Rice King stated that he was trying to take the pistol away from Mary Jones when the killing occurred; that he grabbed her to take the pistol away from her and that in the scuffle the pistol fired; that he did not say anything about her pointing it at him; that he did not say anything about any bruises being on her arm or back; that he said he did not know how the bruises came on her arm and back, if any were there; that after the shot was fired, she caught hold of him and walked about ten feet or ten steps, and that the deceased went down with her arms around him; that he stepped away from her and then went back and got the pistol; that this occurred near the borrow pits next the levee; that he admitted he was in the habit

of going to Jones's house and that he had been intimate
with Jones's wife, and went there for that purpose; that
this intercourse with Jones's wife had been going on for
three years; that on all other occasions before the day
of the killing, the deceased had met him outside, but that
on this morning he had intercourse with her in her house.

On cross-examination this witness stated that Rice
King testified that Mary Jones had the pistol in her hand,
and that it was cocked; that she was walking along talk-
ing to him, and that the further they went, the more cuss-
ing they did; that he grabbed the pistol, and the killing
then occurred; that Mary Jones had the pistol at the time
he went there on the morning of the killing, and that she
had taken the pistol away from him in the town of Luxora
a few days before.

The defendant himself did not testify at the present
trial, but evidence was adduced tending to show that there
was blood on the weeds back of the barn, and none in the
path leading from there to the place where the body of
Mary Jones was discovered.

Other witnesses for the defendant testified that his
reputation for peace and quietude in the neighborhood
was good.

It was also shown that there were no bruises on the
body of the deceased; some of the witnesses for the State
had testified that there were bruises on the breasts and
arms, and her husband had testified that he found a piece
of iron back of the barn that had blood on it.

Without commenting upon the testimony, it is suffi-
cient to say that it fully warranted the jury in bringing
in a verdict of murder in the first degree.

Counsel for the defendant have insisted that the
judgment should be reversed because of the refusal of
the court to instruct the jury on murder in the second
degree. This brings us to a discussion of the difference
between murder in the first degree and murder in the sec-
ond degree under our statute.

(1) No killing is murder unless it is done with mal-
ice and the statute having made two degrees of murder,
it follows that malicious killing is not necessarily murder

in the first degree. It must also be wilful, deliberate and premeditated, or committed in the attempt to commit some one of the felonies mentioned in the statute. *Sweeney* v. *State,* 35 Ark. 585; *Palmore* v. *State,* 29 Ark. 250.

In *Bivens* v. *State,* 11 Ark. 455, the court said:

"It is indispensable then in such cases that the evidence should show that the killing with malice was preceded by a clearly formed design to kill—a clear intent to take life. It is not, however, indispensable that this premeditated design to kill should have existed in the mind of the slayer for any particular length of time before the killing. Premeditation has no definite legal limits, and therefore, if the design to kill was but the conception of a moment, but was the result of deliberation and premeditation, reason being upon its throne, that is altogether sufficient; and it is only necessary that the premeditated intention to kill should have actually existed as a cause determinately fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to afford time for reflection."

(2) It follows that under our statute all other homicide which was murder at common law is now murder in the second degree. This distinction has been followed by the court ever since.

(3) In the case of *Thompson* v. *State,* 88 Ark. 447, and in the cases there cited, it was held that where there was no evidence tending to prove the defendant was guilty of any offense lower than murder in the first degree, the court was not required to instruct the jury on any other grade of the offense. The reason is that if there is no evidence whatever tending to establish a lower degree of homicide than murder in the first degree, it is the jury's duty to take the court's exposition of the law, and the court should decline to give to the jury instructions as to any lower grade of homicide.

(4) On the other hand, if there is any testimony from which the jury might legitimately infer that the defendant was guilty of a lower grade of homicide than

murder in the first degree, it would be the duty of the court to instruct the jury on that degree of the offense.

(5)   In the case before us, the record shows that on the former trial of the case, the defendant had testified as a witness, and admitted the killing, but the admission was accompanied by an explanation of the circumstances attending the killing, and it is an elementary rule of law that when admissions of a defendant in the nature of a confession are allowed in evidence against him, all that he said in that connection must also be permitted to go before the jury. That is to say, whatever explanation he may make in regard to the killing or in regard to the circumstances attending it, are to be admitted in evidence just as much as the admission of the killing itself.

The jury are the sole judges of the weight of the testimony, and the credibility of the witnesses and it was the duty of the jury to consider not only the testimony of the State to the effect that the defendant on the former trial had admitted the killing, but also the explanation he made at the time as to the circumstances attending it. The jury were not required to accept or reject such testimony in its entirety, but it was their duty to accept such portions of the testimony in the whole case as it believed to be true, and to reject that which they believed to be false. *Pickett* v. *State,* 91 Ark. 570; *Allison* v. *State;* 74 Ark. 444.

In the exercise of its right to accept such portions of the testimony as it believes to be true, and to reject that part which it believes to be false, it might have found that the killing, although done with malice, was not the result of a wilful, deliberate and premeditated specific intention to take life on the part of the defendant. Such being the case, the jury might have found that although the defendant was not justified in killing the deceased, or that the killing was not manslaughter within the meaning of the statute, still they might have found that it was a malicious killing and done under circumstances which would constitute murder in the second degree.

(6)   Therefore, we think the court erred in refusing to instruct the jury on murder in the second degree, and

for that error, the judgment must be reversed, but inasmuch as the jury found the defendant guilty of murder, the State may elect, if it sees proper to do so, to have the defendant brought into court to be sentenced for murder in the second degree. Unless such election is made within fifteen days, the cause will be remanded for a new trial. See *Threet* v. *State,* 110 Ark. 152.

KIRBY, J., dissents.