BRAMLETT v. STATE.

4228

Opinion delivered November 10, 1941.

*C. B. Nance* and *A. B. Shafer,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HUMPHREYS, J. The prosecuting attorney of the Second Judicial District of Arkansas, of which Crittenden county is a part, filed an information on June 11, 1941, in the circuit court of said county against the appellant, Freeman Bramlett, charging him with murder in the first degree by shooting and killing Charlie Goad on June 9, 1941, with a shotgun then and there held in his hands after premeditation and deliberation and with malice aforethought.

Appellant pleaded not guilty to the charge of murder in the first degree as charged in the information, and both parties announcing ready for trial, a jury of 12 men was duly empaneled as the law directs and sworn to try the cause and, after hearing the evidence, instructions of the court, and argument of counsel, returned the following verdict, to-wit: "We, the jury, find the defendant, Freeman Bramlett, guilty of the crime of murder in the first degree, in manner and form as charged in the information, and fix his punishment at death by electrocution." Signed—Royce Upshaw, Foreman.

Motion for a new trial was filed and overruled after which a judgment was entered in accordance with the verdict, from which is this appeal.

The first assignment of error insisted upon for reversal of the judgment is that the evidence is not sufficient to support the verdict. It is argued that the evidence, viewed in the most favorable light to the state, fails to show premeditation, deliberation and malice on the part of appellant at the time he shot and killed Charlie Goad.

A definition of premeditation and deliberation in 2 Brill's Encyclopedia, Criminal Law, ch. 19, § 644, was adopted and approved by this court in the case of *Weldon* v. *State,* 168 Ark. 534, 270 S. W. 968, as follows: "Premeditation and deliberation may be inferred as a matter of fact from the circumstances of the case, such as the character of the weapons used, the nature of the wounds inflicted, the acts, conduct and language of the accused and the like."

Malice, which is a necessary ingredient of murder in the first degree, may be express or implied. And this court has decided in a number of cases that the law will presume malice from the intentional use of a deadly weapon in the commission of a homicide unless the existence of malice is overcome by the proof of the killing. Some of the cases so holding are: *King* v. *State,* 117 Ark. 82, 173 S. W. 852; *Reed* v. *State,* 102 Ark. 525, 145 S. W. 206; *Sweeney* v. *State,* 35 Ark. 585; *Howard* v. *State,* 34 Ark. 433; and *Fields* v. *State,* 154 Ark. 188, 241 S. W. 901.

Keeping these definitions and rules in mind in order to ascertain whether the evidence is sufficient to sustain the verdict of murder in the first degree we herein set out a chronological statement of the facts viewed in the most favorable light to the state.

C. H. Bond had been lending Erby Bramlett and appellant money with which to make crops in Crittenden county about 10 miles from the town of Marion. Erby Bramlett and appellant lived near each other in separate homes. It seems that Freeman Bramlett had not been doing his full part in the cultivation of the crops, and there had been some discussion between appellant and Bond relative to this matter. Late in the afternoon of June 9, C. H. Bond, in the company of Charlie Goad and Cecil Goodman, went out to see Erby Bramlett and the crop and stopped at the home of appellant and called to him several times and attempted to get in the house. Appellant did not answer their calls and did not open the door for them although they thought they saw him lying on the bed in the house. After failing to get in the house, the doors being locked, they went over to see the crops and to talk to Erby Bramlett.

Mrs. Joe Hamlett, who lived about 100 yards on the other side of the Bramlett home, stated that on the morning of the 9th of June she noticed appellant and his wife sitting on their front porch about sun-up; that she saw a car leaving the Bramlett home and could not tell who was in it, but that she knew Mr. Bramlett was driving; that the next time she saw appellant during the day was when he came to the pump to get some water, but the pump was not working; that she just saw him as he was leaving the pump and later saw him come out of his home and shoot at a hawk; and that still later she noticed C. H. Bond, Cecil Goodman and Charlie Goad drive up to the Bramlett home; that they stayed there about 5 or 10 minutes and then went away; that between 6 and 7 o'clock she went to her brother's home and that when she got opposite appellant's home the buckets she was carrying knocked together and made a noise, and that appellant raised up from the bed in the north room and looked out at her; that after she returned from her brother's she heard a shot and after the shooting Mrs. Bramlett, appellant's wife, ran up to her.

A colored man by the name of Mitchell testified that during the afternoon appellant came up to where he was plowing and asked him if he wanted a drink of whiskey and that he told him no, and that after offering him the whiskey appellant went back home.

Miss Helen Davis was the step-daughter of appellant. She was 18 years old. She testified that about 8 o'clock p. m. on June 9 she and her grandfather, Mr. Ross, and her mother drove in a car to Marion and called at Judge C. H. Bond's house; after leaving Judge Bond's house they picked up Charlie Goad, who went with them, and that after picking up Mr. Goad they went out to appellant's home and parked the car in the front yard; that when the car stopped they all got out about the same time and that Mr. Goad and her mother walked up on the front porch and that Mr. Goad called appellant 2 or 3 times and that her mother attempted to get in the front door with a key; that while they were on the front porch she and her grandfather went around to the back of the house and then came back to the front of the

house and cut down a cage that contained a squirrel and that while doing so they heard two shots just a few seconds apart and that her mother came running around the house and ran on toward a ditch and that she and her grandfather ran toward the highway; that appellant came out of the front door of the house and shot her grandfather and went to the car and left in it.

J. M. Ross, the father of appellant's wife and grandfather of Helen Davis, testified in corroboration of his granddaughter and in addition explained that they were going to appellant's house to get some of his daughter's clothes; that it was after dark when they reached appellant's home, but that the moon was shining; that he saw Charlie Goad and appellant's wife on the front porch and heard Mr. Goad call appellant several times; that after he and his granddaughter had returned from the back yard and were standing on the front porch and were cutting down a cage that had a squirrel in it, he heard two shots that sounded "sorta muffled"; that his daughter came running around the house from the back and that he himself ran toward highway No. 70 to get help; that after running about 30 or 35 yards he looked around and saw appellant throw up a gun and shoot him in the face and temple.

LeRoy Dalton, a colored man, testified that he lived about one-half mile from the home of Erby Bramlett and that on the night the shots were fired appellant passed his house on the way to Erby Bramlett's home in his car; that he was on his porch when appellant came by and saw appellant flash the car lights on and heard a conversation that occurred between appellant and his brother, Erby Bramlett; that he heard appellant say he had killed one son-of-a-bitch, but that he did not get the right one.

The news was spread around that Charlie Goad had been killed at appellant's home and Ivan Dickson, a deputy sheriff, testified that he arrived at appellant's home about 9 o'clock p. m. the night of the shooting and that there was no one there but Goad's body; that he gained entrance through the back door; found Charlie Goad's body lying on the floor in the kitchen with his

left arm under him loosely holding his pistol; that Goad's flashlight was burning and lying near the kitchen door; that he, Jim Robbins and Gene Dickinson, who were with him, made an examination of the house and found two empty shells and a note on the top of the dresser addressed to Erby stating, ''June 10 is Jr.'s birthday. He will be 10 years of age. If something happens to me see that he gets what is mine if I have anything left. Your brother, Freeman''; that he found the front door thumb bolted and a 16-penny nail driven in the facing of the door to keep the door from coming open; that they found no shot or wads on the floor.

According to the testimony of the physician who arrived on the scene and the funeral director who came about the same time and took the body to the funeral home, Charlie Goad had been shot in the mouth and in the right shoulder, and that there was not an exit to the wounds from either shot; that around the shot in the mouth there were no powder burns, but that the wound in the right shoulder did have powder burns around it.

Appellant, who fled from the scene of the tragedy and first went to see his brother and then later to see a brother-in-law, was arrested the next morning near his home. He had slept during the night in or near the ditch.

Howard Curlin, the sheriff, testified that after arresting appellant he was bringing him back to jail, and that he asked appellant, ''Freeman, why did you shoot Mr. Goad while he was on the floor?'' and that appellant answered, ''I just don't know.''

The sheriff also testified that one of the shells given him showed that it had been ringed, the effect of which was to cause the shot not to scatter.

Appellant took the stand in his own behalf and admitted the killing, but claimed that he shot Goad in the defense of his home saying that during the afternoon of June 9 he went to sleep; that a racket or noise awakened him and that when he roused up there was a flashlight in his face; that he grabbed the gun and shot at the flashlight; that he did not know who it was, but that after he shot the first time the person kept coming toward him; that the flashlight in his face had frightened him,

and that he did not know what it was all about; that he fired the second shot to protect himself, still not knowing who it was coming toward him; that after he fired the second shot he struck a match and lit a lamp and saw what he had done; that he then saw whom he had shot; that he had not heard anyone calling him previous to his being awakened and observing the flashlight in his face; that after he recognized Charlie Goad he wrote a note; that the reason he wrote the note was that he did not know but that he would be apprehended before he got to the sheriff, and did not know what the posse might do; that he had no animosity or feeling toward Charlie Goad and that Mr. Goad was a good friend of his; that he had nothing but the kindest feelings toward Mr. Goad, and had no desire to kill him; that he had not premeditated or deliberated over killing Mr. Goad; that after he had killed Mr. Goad he drove first to his brother's home about a mile and a half from his home; that he told his brother that he had killed Mr. Goad; that after he left his brother's home, he drove to his brother-in-law's out from Luxora and told him of the killing and that he was coming back and give himself up to the sheriff; that after being there about 30 minutes he left and came back the way he went and that when he got to Crawfordsville "the law apprehended him" and he stopped his car; that he got out of the car and stepped across the fence into the field where he stayed all night; that he had a few drinks and went to sleep; that when he awakened the next morning he walked up the ditch bank and was surrounded by deputies; that he gave up and did not know whether he was safe or not; that he knew Mr. Goad was an officer and a popular man; that when he was awakened he could see someone coming toward him; that he could tell that it was a man, but could not tell who it was; that the shades were down just like his wife left them; that he did not make any statement to his brother that he had killed some son-of-a-bitch, but didn't get the right one, as testified by LeRoy Dalton; that he knew Dalton and had never had any trouble with him; that he did not remember shooting his father-in-law; that he did not hear Mr. Goad that afternoon call, "Freeman, Freeman,"

and rattle the front door; that he drove a 16-penny nail in the door facing because his wife had a key and he wanted to keep her from coming in; that he wanted to know who came in; that he did not see Mrs. Hamlett come by; that he was not on the bed in the north room; that after the shooting he did not look to see where he shot Goad; that he pegged the front door so that if anyone came in the house they would have to come in the back way; that the back screen door was hooked, but the thumb-latch was not on it; that the reason he shot Mr. Goad was that Mr. Goad kept coming toward him and he did not know who it was.

We think the evidence is sufficient to show malice on the part of appellant in killing Charlie Goad even if he was surprised and awakened by a flashlight in the night time and grabbed his gun and shot the intruder, not knowing who he was, for he shot him a second time after he was down on the floor. The jury were warranted in finding that the first shot was not fired in close proximity to the flashlight. No powder burns were upon the wound inflicted in or near the mouth. Powder burns were around the wound in the left shoulder. This was the shot that was fired in close proximity to appellant; and his admission to the sheriff that he shot him on the floor without knowing why he did so very clearly indicates malice. He does not claim that there was any necessity for him to fire this shot and this is the shot, according to the testimony of the physician and the funeral director, that caused the death of Charlie Goad. The jury were warranted in finding that the shot was fired after premeditation and deliberation and with malice aforethought. The fact that appellant ringed one of the cartridges is a strong circumstance tending to show that he had deliberated and premeditated over the matter. According to the evidence, if he had not ringed the cartridge the small shot therein would have scattered and not had the deadly effect it did have after being ringed. The effect of ringing it was to cause the shot to travel as a ball would travel and have a deadly effect. There are other circumstances in the record indicating that appellant was in his home premeditating and deliberat-

ing over doing bodily injury to someone who might enter the back door. He had bolted the front door and driven a nail into the facing so as to prevent it from being opened from the outside. He had left the back door unlocked. He had ringed a shell so as to make it more deadly when fired. He had drawn the shades so that no one could see him or could see what he was doing in the house. He had refused to permit Bond and Charlie Goad from entering the house when they called to him and knocked that afternoon. He had refused entrance into the home through the front door to his wife and Goad. After shooting Goad he fled and on his return, instead of going to the sheriff and surrendering as he said he intended to do, he slept in a field near the ditch during the night and made no attempt to surrender at all until he was surrounded by deputies. After discovering that he had killed Goad, he told his brother that he had killed one of the sons-of-bitches, but had not gotten the right one.

Under all the circumstances leading up to the killing; as well as the manner of the killing and appellant's conduct after the killing, we think the evidence is sufficient to support the finding of the jury that there was premeditation, deliberation, and malice on the part of appellant in committing the homicide.

Appellant assigns as error the refusal of the court to give instruction No. 2 requested by him. This instruction defined voluntary manslaughter. But the court gave an instruction defining manslaughter in the language of § 2980 of Pope's Digest. The language of the statute was applicable to the facts and was a clear instruction, and the court was not called upon to multiply instructions. Appellant also argues that instruction No. 2 offered by him should have been given because it defined terror and fear. The theory of appellant as to his right to kill because of the fear aroused in him by being suddenly awakened at night was presented to the jury in an instruction given by the court at his request on the question of justifiable homicide. Appellant assigns as error the modification of instruction No. 5 asked by him so as to add the clause ''acting without fault or neg-

ligence on his part." We think this instruction was properly modified and as modified conforms to the law declared in the case of *Deatherage* v. *State*, 194 Ark. 513, 108 S. W. 904.

Appellant also assigns as error the refusal of the court to give instructions No.'d 8 and 10 requested by him. These instructions were submitted to the court on the theory that Charlie Goad was attempting to arrest appellant, but there is no evidence in the record that any such attempt was made. In fact, the sheriff testified that Charlie Goad had no warrant when he went to the home of appellant and had no intention of arresting appellant and said Charlie Goad went along with the wife of appellant to appellant's home in order to get some of her belongings.

Appellant assigns as error the failure of the court to permit his attorney to read as a part of his argument an extract from American Law Reports Annotated, vol. 34, p. 1482, which extract is set out at length in his brief at pages 54-56. It is unnecessary to set the extract out because the court did not refuse to permit the reading thereof on account of the subject-matter contained therein. It was ruled out in the exercise of the court's discretion and the court had discretion in the matter under the rule announced in the case of *Curtis* v. *State*, 36 Ark. 284. It was said by the court in that case that: "The court may in its discretion permit counsel to read law to the jury in a criminal case, but it is its province to determine whether the law proposed to be read is applicable to the facts of the case. The matter of reading law to the jury, as part of the argument, is under the discretion and control of the court, and its rulings in the matter are not subject to review unless its discretion is abused to the prejudice of the accused."

We are unable to see that the court abused its discretion in refusing to permit attorney for appellant to read the extract.

No error appearing, the judgment is affirmed.