PLESS *v.* STATE.

Opinion delivered February 26, 1912.

1.  TRIAL—RECALLING JURY FOR FURTHER INSTRUCTIONS.—It is within the province of the presiding judge to recall the jury and give them further instructions when in the exercise of a proper discretion he regards it necessary to do so in furtherance of justice; and it is not always necessary that he should repeat the whole charge. (Page 510.)

2.  HOMICIDE—DRUNKENNESS AS EXCUSE—INSTRUCTION.—The court instructed the jury as follows: "Before drunkenness will excuse or lessen the degree of homicide, it must not be voluntarily produced for the purpose of nerving the defendant to carry out a preconceived design to take life, and it must be so complete and to the extent that reason is dethroned and the defendant rendered incapable of having a specific intent to take life. Partial intoxication, which merely arouses the passions and influences the mind of defendant, will neither mitigate nor lessen the degree of guilt if he still knew right from wrong, the probable consequences and results of his acts, and was capable of a specific intent to take the life of the deceased." *Held,* no error. (Page 510.)

3. SAME—DRUNKENNESS—INSTRUCTION.—It is error to instruct the jury to the effect that if the defendant, prior to the killing, formed the specific intent to take the life of the deceased, and afterwards voluntarily became so drunk that he did not know what he was doing at the time of the killing, he would still be guilty of murder in the first degree if he was but carrying out his predetermined purpose to kill the deceased at the time the act was committed. (Page 511.)

Appeal from Pope Circuit Court; *Hugh Basham*, Judge; reversed.

### STATEMENT BY THE COURT.

The appellant was indicted and convicted of murder in the first degree for killing one Lillie Gardner. The testimony shows that she, with her sister, Lucy Kelly, had started home, and were driving along the street in a buggy in the city of Russellville. Lucy Kelly, relating the occurrence, stated that she was the married sister of the deceased girl; that when they got near Mr. Brashear's gate, Cecil Pless ran out and grabbed the lines and said, "Lillie, I want you to tell me the truth." She said: "What is it?" He said: "Are you going to marry me?" She said: "No." He then told her to take off his ring. "While she was taking it off, he pulled his gun, and I jumped out over her, and grabbed him. He slung me down, and shot the horse. He hit me over the head with a gun, while I tried to hold him and told her to run. He then began to shoot at her. She could not run very fast. She ran down the block by Mr. Berry's fence and fell down. I caught him again after she had run to the porch of the house, and tried to hold him. We fell off the porch, and she ran for the gate. She ran and jumped over the fence, and he knocked me down, and ran after her, and jumped over the fence, and when I got there he shot her two times in the breast, it seemed like. She told him not to kill her, and she would go to the courthouse and marry him right then. She said this as she ran. She was shot about sundown, and died that night. I don't know how many times he shot her. He stood over her and loaded his gun after he had emptied it. She told him more than once that she would go to the courthouse and marry him. She said it while he was standing over her loading his gun. He shot the last time as he jumped the fence after her."

Several other witnesses saw the killing, and some testified

that appellant fired two shots at the woman after she had jumped over the fence the last time.

The defendant testified that he did not remember what he did on the day of the killing. He was drunk, and had been for three weeks, on blind tiger liquor; told where he procured his whisky, and how much he had been drinking; said the last he remembered was drinking some liquor down by the railroad tracks that afternoon and giving the corkscrew and keys to a man out in front of the hotel. "I do not remember meeting Lillie that day; do not remember shooting her. The last time I remember seeing her was Monday before that. The first I knew of the killing was the next morning after some one came in and said: 'The girl is dead.' I asked, 'What girl?' Sam Edwards said: 'You know you killed Lillie.' And I fell back on the bed. I don't remember being put in jail."

There was other testimony as to the condition of the defendant at the time the shooting occurred, the man who arrested him saying he looked queer and appeared to be under the influence of some drug. Many of the witnesses testified that he was sober, while others testified that he was very drunk, some in the jail saying that, after vomiting a great deal within a few minutes after being put in jail, he went to sleep and slept soundly until next morning. The physician thought this indicated a state of drunkenness that rendered him irresponsible, not capable of appreciating the result of his acts.

The court instructed the jury, and refused to give appellant's requested instruction No. 1, as follows:

"If you find and believe from the evidence that the defendant was intoxicated, to the extent that he was not conscious of what he was doing, being drunk to the extent that he could have no specific intent to kill, under the law he would not be guilty of murder in the first degree."

Gave instruction numbered 14 on its own motion, defining the extent of drunkenness necessary to reduce the degree of homicide:

"14. You are further instructed that, before drunkenness would excuse or lessen the degree of homicide, it must not be voluntarily produced for the purpose of nerving the defendant to carry out a preconceived design to take life, and it must be so complete, and to that extent that reason is dethroned and

the defendant rendered incapable of having a specific intent to take life. Partial intoxication, which merely arouses the passions and influences the mind of the defendant will neither mitigate nor lessen the degree of guilt, if he still knew right from wrong, the probable consequences and results of his acts, and was capable of a specific intent to take the life of the deceased."

The jury then retired, and after some time returned into court and reported that they had not agreed, and asked the court to instruct them again on the point as to when drunkenness would affect the decree of homicide or excuse the slayer. The defendant asked that the court reread all the instructions to the jury, which was done. They retired again, and did not ask for any further instructions. The attorneys for the State then asked that the jury be recalled, and be given a further instruction. The jury was recalled, and in the presence of defendant and his counsel the court gave, over their objection, instruction numbered 18, as follows:

"18. If you find from the evidence that the defendant, at any time prior to the killing, formed the specific intent to take the life of the deceased, and afterwards voluntarily became so drunk that he did not know what he was doing at the time of the killing, still, if he was carrying out his predetermined purpose to kill the deceased, then such intoxicated condition of the defendant would not lower the degree of the homicide."

The jury returned a verdict of guilty of murder in the first degree, and from the judgment the appeal comes.

*R. B. Wilson,* for appellant.

Instruction 14, given by the court, was negative merely, and should have been followed by the positive instruction, numbered 1, requested by the appellant, charging the jury that if they found and believed from the evidence that the defendant was intoxicated to the extent that he was not conscious of what he was doing, being drunk to the extent that he could have no specific intent to kill, under the law, he would not be guilty of murder in the first degree. But the court erred especially in giving instruction numbered 18 on request of the State, without request from the jury for further instruction, without reading the other instructions in connection therewith or reminding them even that it should be considered only

in connection with the other instructions. By this instruction the court singled out and placed emphasis upon the testimony of one witness. Hughes on Instructions to Juries, § 115; 1 Heiskell (Tenn.) 202; 88 Ark. 458; 81 Ark. 16; 73 Ark. 148.

*Hal L. Norwood*, Attorney General, and *William H. Rector*, Assistant, for appellee.

There is no error in the court's instructions. As to the instruction 18, it should be borne in mind that when the jury first returned into court they specifically requested an instruction upon the point covered by this instruction, that is, that the court give them the law as to the effect of drunkenness in reducing the degree of the homicide or excusing the slayer, 88 Ark. 458; 73 Ark. 148; 81 Ark. 16; 47 Ark. 407-8; 40 Ark. 511; 54 Ark. 284; 91 Ark. 503; 34 Ark. 341.

KIRBY, J., (after stating the facts). It is contended that the court erred in giving said instruction numbered 18 at the time and in the manner it did, without calling attention to the other instructions as part of the law of the case, and that the instruction itself is not the law.

It was within the province of the presiding judge to recall the jury and give them further instructions when, in the exercise of a proper discretion, he regarded it necessary to do so in the furtherance of justice, and it is not always necessary in such cases that he should repeat the whole charge, but this instruction was given to the jury after they had returned once and asked to be instructed again as to the extent of drunkenness that would affect the degree of the crime and all the instructions of the case had been reread to them, and without any request upon their part for further instruction, and also without any caution or admonition from the judge that they should regard it with all the other instructions given as the law of the case. Such practice is not to be commended, although in this instance it may be that the cause would not have been reversed because of it if the instruction complained of had been a correct declaration of law. *Lee* v. *State*, 73 Ark. 148.

The law relating to the extent of drunkenness or the effect necessary to be produced by it upon the mind of the defendant, to reduce the grade of the offense, was properly declared in instruction No. 14 given by the court. *Casat* v. *State*, 40 Ar.k

511; *Chrisman* v. *State,* 54 Ark. 284; *Chowning* v. *State,* 91 Ark. 503; *Wood* v. *State,* 34 Ark. 341.

Defendant's requested instruction No. 1 applied the law as stated in No. 14 to the case as made, and in connection with it was a correct statement of the law, and should have been given. The cause would not have been reversed, however, for the court's failure to give it, since such failure could not have been prejudicial because of instruction No. 14 given. Instruction No. 18 given at the State's solicitation and without request from the jury, after it had retired the second time for the consideration of its verdict, was not the law. It tells the jury that if the defendant, prior to the killing, formed the specific intent to take life of the deceased, and afterwards voluntarily became so drunk that he did not know what he was doing at the time of the killing, he would still be guilty of murder in the first degree, if he was but carrying out his predetermined purpose to. kill the deceased at the time the act was committed; and is contradictory of the law as heretofore laid down in the decisions of the court and as properly declared in instruction No. 14. *Henslee* v. *State,* 97 Ark. 105.

For this error, the judgment is reversed, and the cause remanded for a new trial.