## DAY *v.* STATE.
### Opinion delivered May 2, 1932.

*J. D. Cook, Jr., P. P. Bacon* and *J. D. Cook,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

SMITH, J. This appeal is from a judgment sentencing appellant to life imprisonment upon a conviction for the crime of murder in the first degree, alleged to have been committed by killing Walter Harris, who at the time he was killed was the sheriff of Miller County.

At the time of the killing, appellant, who was nineteen years of age, was engaged in the manufacture of intoxicating liquor, in violation of the law. He had been previously convicted of a violation of the National Pro-

hibition Law in the United States District Court, and was under probation by order of said court to Sheriff Harris.

Having information that appellant had resumed the making of liquor, the sheriff, with three deputies, went to appellant's still to arrest him on the afternoon of July 28, 1931. When the officers came to within a hundred yards of the still, they could hear the persons there employed about the still, and the officers separated. The sheriff and one deputy came up to the still on one side, while the other two officers approached the still from the opposite side. The still was in a thicket, through which a branch or small creek ran. A negro man, who apparently was acting as a lookout, came out of the thicket, and was ordered by the sheriff to halt. This command was repeated, when the negro began to run, and the sheriff shot him, but no other shot was fired by the sheriff, according to the testimony on behalf of the State.

The officers entered the thicket, and as the the sheriff got to the edge of the thicket near the still, appellant opened fire upon him, firing four times, and one of these shots killed the sheriff. The officers could not see the man who was firing, as he was crouched and concealed in the foliage of the thicket.

Appellant admitted firing the shot which killed the sheriff, but he testified that he did not know that the parties who had come upon him and his associates were officers. He testified that he heard shooting, and saw the negro fall, and, when he looked to see where the shot came from, he saw a stooping man pointing a gun at him through the bushes. The man fired, and the shot from the gun knocked his hat off, whereupon he drew his pistol and commenced firing, and continued to do so until the man fell. He then ran away without knowing that he had shot an officer.

At appellant's request, the court gave an instruction numbered 6½, which reads as follows: "You are instructed that, if you believe from the evidence that the defendant was placed in the position, at the time of the

killing, in which his life was imperiled by the deceased, and he slew him without having any notice of his official character, and the killing was apparently necessary to save his own life, or to prevent his receiving a great bodily injury, then the killing of deceased was homicide in self-defense; nor does it matter that deceased was legally seeking to arrest defendant, if the defendant had no notice of the fact, or reasonable grounds to know that he was an officer; and, if you so find, it is your duty to acquit the defendant.''

This instruction presents the law as favorably to appellant as he had the right to ask, but it is insisted that it was nullified by another, numbered 17, which was in conflict with it. This instruction reads as follows: ''If you find from the evidence in this case, beyond a reasonable doubt, that the defendant was engaged in operating a still, and that deceased, as sheriff, went to such still for the purpose of arresting such person or persons as were operating the same, and that, while advancing on such still for such purpose, he was shot and killed by the defendant, at a time when he had not fired on the defendant; and if you further find from the evidence, beyond a reasonable doubt, that the defendant intentionally shot and killed the deceased under such circumstances for the purpose of preventing his arrest by the deceased, you will find the defendant guilty of murder in the first degree. And if you find these things to be true from the evidence, beyond a reasonable doubt, then you are told that it is not necessary that the defendant should have known the particular identity of the deceased at the time.''

We think there was no conflict in these instructions. The one declares the law applicable to the facts as appellant contends them to be; the other announces the law applicable to the case which the State's testimony tended to establish. It was appellant's contention that a murderous assault was made upon him and his associates by persons who did not disclose their identity as officers, and who were not known to be officers, and that appellant

fired the fatal shot to repel this unlawful assault. On the other hand, it was the theory of the State that the negro was shot to prevent him from escaping, and that appellant immediately thereafter commenced firing at a man known by him to be the sheriff, and that his purpose in firing was to prevent an arrest being made.

As tending to show that appellant could have seen and did know at whom he was firing, testimony was offered to the effect that an officer stood at the place where the sheriff fell, and another at the place where appellant stood when he fired, and that persons thus placed could have seen and recognized each other. The admission of this testimony is assigned as error, and the case of *Vance* v. *State*, 70 Ark. 272, 68 S. W. 37, is cited to sustain this assignment.

The facts in the two cases are not similar. In the Vance case one attorney for the State, representing the deceased, and another attorney for the State, representing the defendant, gave, under the direction of a State's witness, "a sort of dramatic representation of the tragedy." It was there said: "We can very easily see that a defendant might be irreparably injured by having his actions presented in that way before the jury by unfriendly actors not under oath and paid to prosecute him, and if the record fully presented a case of that kind it would certainly be a serious question as to whether it would not call for a reversal and a new trial. But, though the record is a little vague on that point, we conclude from it that the court only permitted the witness to illustrate the relative positions and the distance between the parties at the time of the shooting. We are not certain that it shows more than this, and we cannot therefore say that there was error. We, however, call attention to this point, for it seems to us that there is room enough for all needful display of the dramatic powers of counsel in the regular walks of the profession, and that it is unnecessary, and even unsafe, to go further, and tread more or less on the domain of the witness."

Here the point at issue was whether appellant could have seen the man who shot, and therefore have known who the man was, and that this man was an officer, the sheriff, and well known to appellant as such. To establish this fact, a witness was permitted to testify that, standing where appellant stood when he fired, he could have seen and recognized a man standing where the sheriff fell. We think this testimony was competent.

An objection somewhat similar was made to the admission in evidence of a plat showing the location of the scene of the tragedy and of the participants therein. This plat was drawn by one who was not present at the time of the shooting but who had later visited the scene, but the accuracy of the plat was established by witnesses who were present, and we see no objection to its use in enabling witnesses who were present to better illustrate their testimony.

Testimony was offered over the objection of appellant, to the effect that he stated that he had once been shot by officers who raided a still which he was operating, and that he did not intend for this to happen again, and that, if officers came down upon him again, he would fight it out with them. The witness so testifying stated that appellant had reference to prohibition enforcement officers. In our opinion, this testimony was competent. The defense was predicated upon the proposition that appellant did not fire to resist arrest, but to repel an assault, and that he had been fired upon by persons not known by him to be officers. It is true appellant's threat was not directed against the sheriff specially, or against any other particular officer. But it was a threat against any and all officers who might attempt to arrest him, and tended to show his intention in firing the fatal shot, and that it was fired pursuant to his intention to resist officers attempting to arrest him.

In the case of *Stoddard* v. *State*, 169 Ark. 598, 276 S. W. 358, we quoted from 28 A. & E. Enc. of Law, 145, as follows: "No particular words are necessary to convey

a threat. Any language which shows this, either on its face or in connection with the circumstances under which it was spoken or written and with the relations of the parties, is sufficient, though it consists merely of innuendoes and suggestions.''

In the case of *Tolliver* v. *State*, 183 Ark. 1125, 40 S. W. 421, we said: ''At page 732 of Underhill's Criminal Evidence (3d ed.) it is said: 'Under certain circumstances the vague and uncertain threats of the accused may be shown to prove the condition of his mind at the time of the crime. The rule is applied to his declarations that he is going to kill somebody, without mentioning any names, or that he is going to make trouble, or that he is going to shoot some one, or similar indefinite threats which indicates that he is in an ugly frame of mind and disposed to commit some crime, though not the particular crime for which he is on trial.' The numerous cases cited in the note to the text quoted fully sustain the law as stated, among these being an Arkansas case, which does not appear as having been published in our official reports.''

Appellant insists that such remarks as he made in this connection did not refer to the sheriff or to any other officers except Federal officers Quillian and Weaver, who had shot him on a previous occasion. But we think this was a question of fact for the jury.

The court refused to admit testimony to the effect that the deceased sheriff had killed more than one man in making arrests, but the court admitted testimony concerning the general reputation of deceased as being a violent and impulsive man. There was no error in this ruling. The reputation of the deceased for violence could not be properly proved by specific acts of violence to third persons. Underhill's Criminal Evidence (3d ed.), page 724. In the case of *Hardgraves* v. *State*, 88 Ark. 261, 114 S. W. 216, it was held (to quote the headnote in that case) that, ''In a prosecution for murder, it is not competent to show the violent and dangerous character of the

deceased by evidence of isolated facts or particular acts of violence.'' That holding was reaffirmed in the later cases of *Shuffield* v. *State*, 120 Ark. 458, 179 S. W. 650; *Biddle* v. *State*, 131 Ark. 537, 199 S. W. 913, and *Jett* v. *State*, 151 Ark. 439, 236 S. W. 621.

Objection was also made to the testimony of a witness, who had been engaged with appellant in making the liquor, that appellant constantly carried his pistol while employed about the still. But we think this testimony was competent as bearing upon appellant's mental attitude in regard to not being rearrested for his illegal conduct.

Appellant offered to prove by the physician who attended the negro that the wound inflicted upon the negro by the sheriff was of a dangerous character, and, when asked by the trial judge what the purpose of the question was, appellant's counsel answered: ''It shows the wantonness of the assault by the officers on the defendant, and that the attack upon the negro was made regardless of the consequences to him, and shows that the sheriff used no caution and was impulsive in shooting him, and I think it is material.'' The prosecuting attorney remarked that ''the sheriff had a right to shoot the negro under the circumstances detailed in evidence.'' Appellant's counsel remarked: ''Well, now, the defendant thinks he did not have such a right; so, there you are.'' The judge then stated: ''The court holds the sheriff did have a right to shoot the witness, Joe Watson, under the circumstances, and the objection is sustained.''

Objection was made to this remark, and the court was asked to withdraw it, whereupon the judge said: ''I will do that gentlemen. I will qualify the statement by saying that the sheriff had the right to shoot the witness, Joe Watson, if, under the circumstances as outlined by the witness, Joe Watson, and as outlined by the other witnesses, the sheriff was undertaking to arrest him, and if it occurred or appeared to the sheriff, in the reasonable exercise of his duty as sheriff, that it was necessary to shoot him to arrest him.''

We think it would have been better for the court to have excluded the testimony as to the character of the negro's wound without comment, but the amended statement of the court is not an incorrect declaration of the law. The sheriff had the right to shoot an escaping felon "if it occurred or appeared to the sheriff, in the reasonable exercise of his duty as sheriff, that it was necessary to shoot him to arrest him." Section 2377, Crawford & Moses' Digest; *Carr* v. *State,* 43 Ark. 99; *Thomas* v. *Kinkead,* 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am. St. Rep. 68; *Green* v. *State,* 91 Ark. 510, 121 S. W. 727; *Jett* v. *State,* 151 Ark. 439, 236 S. W. 621.

The cause was submitted to the jury upon the conclusion of the argument at about 7:30 P. M. on December 10, 1931, but, on account of the lateness of the hour and of the illness of a juror, the consideration of the case was not taken up by the jury that night. The condition of the juror became more serious, and a doctor was called to attend him. Upon being advised of the juror's illness, the trial judge called at his room on the following morning, but it affirmatively appears that the judge's visit was intended solely to ascertain the juror's condition and his ability to proceed in the case, and there was no discussion whatever of the merits of the case between the judge and the juror. We think there was no error in this.

When the court was convened, the judge made a statement in open court concerning the juror's condition, and no request was made that the jury be discharged. On the contrary, it was agreed that the other members of the jury should repair to the room of the sick juror, and that if a verdict was agreed upon it might be received in the juror's room. The jurors met and deliberated upon the case in the room of the sick juror, and, when it was announced that a verdict had been reached, the court and its officers and the counsel in the case, together with appellant, went to the room where the sick juror was in bed in a house two blocks away from the courthouse, where the verdict was received and the jury was discharged.

The juror's illness developed into pneumonia, and he died a few days later.

It is insisted that this was prejudicial error calling for the reversal of the judgment pronounced upon the jury's verdict, although appellant had consented to the court's action in the matter.

In the case of *Mell* v. *State*, 133 Ark. 197, 202 S. W. 33, L. R. A. 1918D, 480, the court adjourned, over the objection of the defendant, to a hotel to hear the testimony of a witness who was too ill to be present in court. We there said that there were jurisdictions in which it had been held that this might be done unless prohibited by statute, but that it was not permissible under our practice when objection was made, and we reversed the judgment in that case on that account.

The case of *Carter* v. *State*, 100 Miss. 342, 56 So. 454, Ann. Cas. 1914A, 369, was cited among other authorities, as having so held. It was said in that case that: "If the defendant had consented to the proposition to go with the court and jury to the place where the witness was, and there take her testimony, and if her testimony had in this manner been taken, we do not think the defendant could have objected to the irregularity. But that is not the question before us. In this case the defendant's application for a continuance was refused; one of the grounds of the refusal being that he declined to accept the proposition of the court to go with the jury to the place where the witness was confined by sickness, and there take her testimony. Such a proposition was, we think, no answer to his application for a continuance, and should not be considered in determining his right to a continuance."

It thus appears that the Supreme Court of Mississippi would have held that the irregularity in the proceeding was not prejudicial, had the defendant consented, as the record in the instant case shows was done.

In the case of *Jackson* v. *State*, 102 Ala. 76, 15 So. 351, it was held by the Supreme Court of Alabama that a

verdict was void which had been delivered to the judge outside of the courthouse, but it was not there shown, as it was here, that the defendant had consented that this should be done.

It was held by this court, in the case of *McVay* v. *State,* 104 Ark. 629, 150 S. W. 125, that a defendant who was convicted of murder in the first degree had the power to waive the presence of the trial judge during the progress of the argument of the case and to consent to the argument being proceeded with in the absence of the judge.

In the case of *Davidson* v. *State,* 108 Ark. 191, 158 S. W. 1103, Ann. Cas. 1915B, 436, which was also a capital case, it was held that the defendant had the right to waive his presence in court upon the return of the verdict, and that the verdict might be returned in his absence with his consent.

We therefore hold that, having consented, appellant was not prejudiced by the reception of the verdict at a place other than the courthouse.

It is insisted that it was error to permit the jury to proceed after one of its members became ill, as he was entitled to have his case considered and decided by jurors in normal condition. This objection was not made at the trial; indeed, it appears that appellant consented that it should be done.

The physician who attended the juror was interrogated by counsel for appellant concerning the juror's condition, and testified as follows: "Q. A man as sick as he was, in your opinion was he capable and competent of deliberating upon serious and important matters? A. Yes, sir. Q. You think he was? A. Yes, sir."

It is also assigned as error that the trial judge interviewed the sick juror in the absence of his fellows, and in the absence of appellant and his counsel. But there is incorporated in the record a statement by the trial judge to the following effect. When he was advised of the juror's illness, he called at his room to inquire as to the

juror's condition. He told the juror that unless he felt perfectly able to continue to serve as a juror he would be discharged, but he was assured by the juror that he felt able to continue his duties as a juror in the case. The judge further stated: "At that time the jury had not commenced its deliberations, and upon being assured by both the nurse and the doctor, in addition to the statement of the juror, that the juror was rational, and that for him to stay in that room in the bed and deliberate, take part in the deliberations of the jury, was not detrimental to his chance for recovery, and upon the appearance of the juror to me at that time, and the statement of the juror that he was able and willing to proceed, the jury was told to commence its deliberations whenever they saw fit to begin their deliberations."

It would, of course, have been improper, under these circumstances, for the trial judge to have discussed with the juror any question of law relating to the verdict to be returned, but this he did not do. *Wacaster* v. *State,* 172 Ark. 983, 291 S. W. 85; *Shue* v. *State,* 177 Ark. 605, 7 S. W. (2d) 315; *Phares* v. *State,* 158 Ark. 156, 249 S. W. 551.

The judge's conversation with the juror related only to the physical and mental condition of the juror, for the purpose of ascertaining whether the jury should be discharged. We conclude therefore that there was no prejudicial error in this incident. *Spence* v. *State,* 180 Ark. 1123, 24 S. W. (2d) 331.

It is also insisted that prejudicial error was committed in refusing appellant a preliminary trial. This feature of the case was inquired into in a *habeas corpus* proceeding brought to require a preliminary hearing, which the court refused to order.

It appears that at this time the defendant had been indicted, and that he was immediately thereafter put to trial. It also appears that there had previously been no preliminary trial for the reason that appellant's father had requested that, pending appellant's trial, he be re-

moved from the county and confined elsewhere on account of the inflamed condition of the public mind arising out of the killing, and it does not appear that appellant or his counsel had demanded a preliminary examination prior to his indictment.

It was held in the case of Ex parte *Anderson,* 55 Ark. 527, 18 S. W. 856, that one who has been committed to jail by a coroner for the crime of murder, upon an inquisition conducted in his absence, was not entitled to be taken before a magistrate for preliminary examination.

The purpose of the preliminary examination is to determine whether an accused person should be held to await the action of the grand jury, so that he may not in the meantime be unlawfully deprived of his liberty. No useful purpose would have been served by holding a preliminary examination. It is provided by statute that: "If, however, the magistrate is of opinion, from the examination, that there are reasonable grounds to believe the defendant guilty of the offense charged, he shall be held for trial and committed to jail, or discharged on bail if the offense be bailable." Section 2932, Crawford & Moses' Digest.

Section 2934, Crawford & Moses' Digest, provides that: "Justices of the peace shall have no power to admit to bail in capital offenses, murder or manslaughter."

A justice of the peace would have been without authority to admit appellant to bail upon an examining trial before indictment returned, if there were reasonable grounds to believe he was guilty, even of manslaughter, and he had already been indicted for the crime of murder in the first degree. A justice of the peace would therefore have had no jurisdiction of the case. Ex parte *Kittrell,* 20 Ark. 499; *Bass* v. *State,* 29 Ark. 142; Ex parte *Graham,* 150 Ark. 236, 234 S. W. 176.

A motion was filed to quash the indictment upon the ground that the jury commissioners who selected the grand jury which returned the indictment and the petit jurors who tried the case were not sworn, and that there

was no affirmative showing that § 6344, *et seq.,* Crawford & Moses' Digest, relating to the manner in which jury commissioners shall perform their duties, were complied with. The record does not affirmatively show that the jury commissioners were sworn or that the statute defining the manner in which their duties shall be performed was complied with, but there was no showing to the contrary, and the presumption must be indulged that the statute was substantially complied with.

Similar contentions were made in the case of *Brewer* v. *State,* 137 Ark. 243, 208 S. W. 290, but in overruling them it was there said: "It is true that the record in the present case does not contain the orders of the court showing these facts, but, as we have just seen, the presumption is that the grand jury was organized in accordance with the requirements of law unless the contrary shall be made to appear affirmatively by the record. It may have been in the present case that the docket of the circuit judge showed that he had appointed jury commissioners, and that he had selected the grand jury in the manner prescribed by the statute, but that these orders had not been entered of record." It was there said that, under our system, there are two modes by which a grand jury may be selected. One is pursuant to the provisions of the statute; the other in the exercise of the court's inherent power; so that juries may be impaneled, even though the jury commissioners wholly fail to perform their duty.

Certain other errors are assigned, but they relate to matters which have been definitely decided adversely to appellant's contentions and require no further discussion.

Upon the whole case we find no error prejudicial to appellant, and the judgment must be affirmed. It is so ordered.