TAYLOR *v.* STATE.

4456                                                    204 S. W. 2d 379

Opinion delivered September 22, 1947.

*H. S. Grant*, for appellant.

*Guy E. Williams*, Attorney General, and *Oscar E. Ellis*, Assistant Attorney General, for appellee.

ED. F. McFADDIN, Justice. Lucy Taylor was convicted of second degree murder on an information charging her with having killed Earl Sullivan by striking him over the head with a certain blunt instrument. From that conviction she has appealed. The only question that has given us serious concern is whether the evidence was sufficient to take the case to the jury. The defendant offered no evidence, but relied on the insufficiency of the State's case. Viewed in its most favorable light, the evidence offered by the State proved, or tended to prove, these facts:

The deceased was infatuated with the defendant. About noon of March 26, 1946, the deceased and the defendant were together in Augusta. The deceased was in an intoxicated condition, and opened his billfold and showed his money (said to be several hundred dollars), and the defendant made the remark, "We are getting away from here." On the same day the deceased and defendant, accompanied by Sam Taylor, Mrs. Sam Taylor and Cal Kaysinger, left Augusta about 2:00 p. m. to go to deceased's cabin on the shores of Taylor Bay, a journey of about 45 minutes. Shortly after 4:00 p. m. the defendant and the three others previously named returned to Augusta, and reported at the sheriff's office that the deceased had just drowned in Taylor Bay.* The defendant returned to Taylor Bay with the party, and pointed out to the officers the location where she said the deceased had gone down, and she helped recover the body, which was found in the water ten or fifteen feet from the place she had designated. The deputy sheriff testified

---

* Little Bay is a branch of Taylor Bay, and some of the witnesses referred to Little Bay.

that the defendant, and Sam Taylor and wife, and Cal Kaysinger showed the effects of recent drinking. An autopsy performed by Dr. McGuire, the coroner, established that the deceased did not die by drowning (no water in his lungs and no evidence of swimmer's cramp), and also that the deceased did not die from heart failure (the heart was normal). The autopsy revealed that the deceased had suffered a blow on his head over the right eye, which blow did not fracture the skull, but produced a hemorrhage of the brain, and Dr. McGuire testified that this hemorrhage was the cause of death. An oar was found near the deceased's cabin, several hundred feet or more from the shores of Taylor Bay, and witnesses said that the oar showed a "fresh break." When deceased's body was recovered, he was wearing only long underwear and a leather jacket. His other clothes—all wet—were found on the bank of Taylor Bay. The purse contained only sixty-five cents. The billfold was never found. Deceased's watch, with water under the crystal, was found in the road about 50 feet south of his clothes. It was testified that on March 26, 1946, the weather was a little cool for swimming. The depth of Taylor Bay was about 18 feet; there was no current.

On the facts as above recited, the State claimed that the defendant had killed the deceased by striking him with the oar—or aided and abetted others in such killing —and that deceased's body had been thrown into the bay to indicate drowning. Robbery was advanced as the motive for the murder.

The defendant offered no evidence, but the State introduced statements that the defendant made to the officers at the time of the recovery of the deceased's body, and also at the coroner's inquest. The substance of these statements was, that when the defendant and deceased and the others reached defendant's cabin on the bank of the bay, some of them went out in the boat, and that deceased fell out of the boat and struck his head on the side of the boat; that they pulled deceased out of the water and that they all started to go to the deceased's cabin

where they were to have a fish fry; that while the others were preparing to cook the fish, the deceased bantered the defendant for the two of them to swim across the bay and back, a total distance of about 140 feet; that they swam across the bay, and were about halfway back when deceased made an outcry and sank in the water; that the defendant was almost exhausted, but was able to swim to the bank and give the alarm; and that defendant and the others, after unsuccessfully trying to recover the body, then went to Augusta and reported deceased to have drowned.

In addition, the sheriff testified that, while the case was pending, the defendant told him that she would not have had to knock the deceased in the head, because he would have given her money; that the others might have taken the deceased's money, but that she had not done so.

We have detailed the evidence at considerable length to show that, in the final analysis, circumstantial evidence must be relied on to determine whether the deceased met his death at the hands of the defendant, or died through deceased's own act. The issue presented from the State's testimony was (1) whether the deceased was killed by a blow on the head inflicted by the defendant; or (2) whether the deceased struck his head on the side of the boat, and such blow caused his subsequent death while he was swimming. The State called the coroner, Dr. Mc-Guire, to establish that the deceased died as a result of a blow on his head. The defendant's attorney asked the doctor, concerning the deceased: "Q. If he did fall and hit his head on the side of the boat, would that cause him to have the abrasion on the side of his head like that? A. If he was living when he fell, yes, sir. Q. How long does it take for the blood to get into the capillaries? A. It takes some time. Q. Say a man was hit in the back of the head with a beer bottle, won't the blood capillaries get into the brain? A. Yes, sir, you get that in the brain. Q. That is the way this condition was found, where the blood went in the brain? A. Yes, sir. . . . Q. If he had fallen on the boat and struck his head on the side of

the boat and made that abrasion, would that have caused it? A. If he was living at the time? Q. Yes? A. Yes, sir. Q. Could that have caused the death in this case? A. Yes, sir, it could have caused the death."

On redirect examination the prosecuting attorney asked the following question, and was answered as follows: "Q. Mr. Grant has asked you with reference to the deceased falling and striking his head against the gunwale of the boat, I will ask you if in your opinion, if the deceased fell out of the boat, whether he struck his head or not, and then he came out on the bank and walked down the bank three or four hundred yards and went in swimming, could he do that? A. Yes, sir, things like that happen. A few months ago a man went to the University Hospital and then he went back home and died the next day." Somewhat similar questions and answers appear repeatedly; but we give the above as typical.

The State did not attempt to explain away Dr. McGuire's testimony on this point, so that the record here before us presents a case where the State relied on circumstantial evidence, and yet did not negative circumstances tending to show that the deceased died by his own act. Such negation was vital to the State's case. We therefore have a chain of circumstances offered by the State with one vital link in the chain left unclosed, i. e., the State did not show that the deceased could not have come to his death by his own involuntary act of striking his head on the side of the boat. Until the State offered testimony legally sufficient to establish the defendant's guilt beyond a reasonable doubt, the evidence was too slight to justify a conviction. The recent case of *Johnson* v. *State,* 210 Ark. 881, 197 S. W. 2d 936, is apropos; we quote: "The evidence against the accused was entirely circumstantial. In such cases it is required that the evidence relied on must show the guilt of the accused to a moral certainty and must exclude every other reasonable hypothesis than that of the defendant's guilt. Judge BUTLER, speaking for the court, said in the case of *Bowie* v. *State,* 185 Ark. 834, 49 S. W. 2d 1049, 1052, 83 A. L. R.

426: 'This demands that, in a case depending upon circumstantial evidence, the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty and must exclude every other reasonable hypothesis than that of the guilt of the accused. Circumstances, however strong they may be, ought never to coerce the mind of the jury to a conclusion of guilt if they can be reconciled with the theory that one other than the defendant has committed the crime or that no crime has been committed at all.' "

We cannot do better than to paraphrase and apply to this case the language used by Mr. Justice FRAUENTHAL in the case of *Reed* v. *State,* 97 Ark. 156, 133 S. W. 604: It may be that the defendant is guilty of the crime, but a careful examination of the evidence shows that it was too slight to justify a conviction. It may be that on a future trial additional evidence may be introduced showing guilt.

The judgment of the lower court is therefore reversed, and the cause remanded for a new trial.