JOE NEWTON KAGEBEIN *v.* STATE OF ARKANSAS

5665                                                    496 S.W. 2d 435

Opinion delivered July 9, 1973

*Wright, Lindsey & Jennings,* by: *H. William Allen,* for *appellant.*

*Ray Thornton,* Atty. Gen., by: *James A. Neal,* Asst. Atty. Gen., for appellee.

JOHN C. DEACON, Special Chief Justice. The appellant, Joe Newton Kagebein, at the time 15 years of age, was charged by information, along with three other teen-agers, with first degree murder because of the death of Jimmy Wayne Wampler. Kagebein's motion for a severance was granted, and after a jury trial, he was found guilty with no recommendation for leniency. Judgment was entered sentencing him to death in the electric chair. This Court appointed new counsel to represent appellant on appeal. Twelve points for reversal are presented, some of which have merit and require reversal.

A confession taken from Kagebein was introduced into evidence and Kagebein also testified personally. None of his companions testified, all of them refusing to answer questions on the ground that it might incriminate them.

The evidence showed that on Novermber 7, 1970, Joe Newton Kagebein, who had been living with his grandmother in DeWitt for a few months, was in the company of three older teen-age boys, Teddy Kittler, Benny West and Larry Mannis. Mannis borrowed a car, got some money and bought some beer. They consumed the beer, and around 9:00 p.m. Mannis went to a liquor store in Gillett through the back entrance, but was told by the proprietress that she was not going to sell him anything to drink because of his age. Kagebein says he was asleep at that point, but awoke sufficiently to hear the other boys talking about a man that would buy them some beer if they would let him "do that act on them." He fell asleep again and says he was not awake when his companions came in contact with Jimmy Wayne Wampler, a 27-year-old Cross County farmer.

About 10:00 p.m. that night, Wampler came into the same liquor store where Mannis had been declined service and Wampler bought three six packs of beer. Kagebein says that he was first aware of Wampler when he awoke and found Wampler and the other boys arguing in the car. Kagebein noticed that when Wampler got out of the car he was wearing a ladies' night gown.

Neither Kagebein's confession nor his testimony presented a very clear picture of the facts. The account was disjointed and difficult to follow. Kagebein did testify that he was sick from the beer that he had consumed, that he was with Benny West on the other side of the car, and that darkness prevented him from seeing what was going on a part of the time. He said that Wampler ran after the boys and that Wampler knocked one of the boys against the car and knocked Teddy Kittler into a ditch. He said that all of the boys held guns on Wampler at different times, but claimed that this was done to keep Wampler off them. Kagebein did admit that he hit Wampler once on the right side of the head with a .22 to protect the other boys and that after he struck this blow, Mannis took the gun away from him. His confession contained a statement that all four of the boys knocked Wampler down, and that Wampler yelled at them not to shoot him. Kagebein said that Teddy Kittler shot Wampler while Wampler was on the ground, but that he did not know who administered the bruises and marks on Wampler's back and chest.

After Wampler was shot, the boys started back to DeWitt and they let Teddy Kittler out at his home. The other three boys then drove on to the court square in DeWitt and located Chief of Police James Mason and Officer Wendell Best, who were on patrol. Mannis and West got out of the car and began telling them about a killing south of DeWitt. Mannis was in a very upset condition and fainted on the sidewalk. Mason and Best testified that there was no evidence of physical violence on any of the boys and that the boys did not appear to be drunk. Chief Mason radioed other law enforcement officers and they had West lead them to the scene described by the boys. When the officers arrived there they found Wampler's body in a bruised and mutilated condi-

tion. The only clothes on the body were a pair of boots and a torn piece of ladies' panties on one leg, with a ladies' night gown lying under and partially draped over the head. Wampler's clothing was found lying in a neat bundle on one side of his truck.

The first point urged for reversal is that the introduction of hearsay statements allegedly made in the presence of appellant was a denial of his right to remain silent. On two occasions during trial, the State elicited testimony, over objection, from the police officers to make a showing that statements were made by Kagebein's companions in his presence while he and the others were in police custody, and that Kagebein remained silent in the face of the statements.

Patrolman James Oswald, one of the State's witnesses, testified that he was at the hospital with Mannis and Kagebein, that Mannis was unconscious for about an hour, and that after the doctor revived him a little bit and Mannis kept saying he was seeing a dead man, a nurse or someone asked him, "How do you know it was a dead man?" and that Mannis replied, "Because we killed him." The State specifically asked patrolman Oswald whether Kagebein denied the statement, and received a negative reply from Oswald.

The second statement was detailed by Arkansas State Trooper Travis Nash who, over objection, with testimony to specifically indicate that Kagebein was in close enough proximity to hear the remark, said that "one of the boys" was laughing about Joey jumping up and down on the man's stomach after he was dead and that Kagebein did not deny the statement at the time.

The State's questioning and the court's ruling on the defense objections indicate that the testimony of Oswald and Nash was offered as an exception to the hearsay rule, commonly called the "tacit admission rule." Kagebein was in police custody and in the presence of the police when both statements were made. He had not yet been advised of his rights and could not have intelligently waived them. Under these circumstances, Kagebein's silence must

be assumed to be an assertion of his right against self-incrimination. The introduction of the hearsay statements was a denial of Kagebein's right to remain silent and constituted prejudicial error.

This rule affecting tacit admissions was stated in *Miranda* v. *Arizona,* 384 U.S. 436 (1966):

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

The effect of the *Miranda* decision upon the tacit admission rule has been recognized by this Court. *Gross* v. *State,* 246 Ark. 909, 440 S.W. 2d 543 (1969).

Ever prior to *Miranda,* our Court rejected this type of testimony under certain circumstances, as indicated by *Anderson* v. *State,* 197 Ark. 600, 124 S.W. 2d 216 (1939), where we said:

" 'One cannot be compelled, when not offering himself as a witness in his own defense, to give evidence in court tending to incriminate himself. Much less should he be compelled to do so out of court. If silence in such case is evidence of guilt, then one charged with crime must, under penalty of himself creating most damaging evidence against himself in support of the charge, enter into a controversy of words with every idle straggler who may choose to accuse him to his face.' *Merriweather* v. *Commonwealth,* 118 Ky. 870, 82 S.W. 592, 4 Ann. Cas. 1039."

The Missouri Supreme Court in *State* v. *Penn,* 413 S.W. 2d 281 (1967), considered this point and said:

"Sheriff Bethel's relation of what [the third party] said was "purely hearsay.' *State* v. *Higgins,* 321 Mo. 570, 12 S.W. 2d 61. The State apparently offered the

testimony on the theory that appellant's silence when [the third party's] statements were made in his presence, constituted an admission of his guilt and an exception to the hearsay rule. If this was the prosecuting attorney's theory, the testimony was inadmissible. 'The rule of the law in this state is well settled that, while the defendant is in custody or under arrest, statements of a third party, made in his presence, and not denied, are inadmissible at the trial.' "

Some of the appellant's other points for reversal should be mentioned, for they may arise upon a retrial. The appellant urges that the exclusion of evidence of prior homosexual advances of the deceased was error. The appellant's defense, even though he was being tried as an accessory before-the-fact to a charge of first degree murder, was that the death of Wampler came about not as a part of a pre-arranged plan to rob and kill him, as argued by the State, but out of resistance to his homosexual advances. Appellant does not argue that the evidence of homosexuality justifies homocide but does insist that he should have been permitted to introduce evidence tending to corroborate the claim that homosexual activities preceded the killing. He urges this was important at least to the jury's consideration of the degree of homicide committed.

The State anticipated this defense and as part of its case in chief presented evidence designed to rebut any suggestion that Wampler might have bargained to trade beer for homosexual favors. Wampler's cousin, J. A. Wampler, testified that the deceased usually bought beer before going deer hunting. The owner of a dress shop in Stuttgart testified that it would be uncomfortable for a person as large as Wampler to wear the size night gown and panties found with the deceased's body.

Thus the issue of homosexuality was before the jury, but only through the evidence offered by the State. From voir dire through the defense testimony, all attempts by the defense to determine attitudes of the jury toward homosexuality and to introduce testimony of prior specific acts suggesting that Wampler had been in-

volved in extending improper invitations in the past to boys were rejected by the court.

When character evidence is offered to characterize or explain the acts of the deceased, the general rule is that proof should be confined to the general reputation of the deceased and that inquiry should not be permitted concerning specific acts or conduct. *Montague* v. *State,* 213 Ark. 575, 211 S.W. 2d 879 (1948). Even when directed toward a defendant, rather than to the deceased as in this case, evidence of prior similar offenses has been admitted when the charge involved unnatural or unusual sexual acts. *Ward* v. *State,* 236 Ark. 878, 370 S.W. 2d 425 (1963); *Alford* v. *State,* 223 Ark. 330, 266 S.W. 2d 804 (1954); *Roach* v. *State,* 222 Ark. 738, 262 S.W. 2d 647 (1953); *Hummel* v. *State,* 210 Ark. 471, 196 S.W. 2d 594 (1946); *Hearn* v. *State,* 206 Ark. 206, 174 S.W. 2d 1943). One reason for allowing evidence of prior sexual misconduct when the case involves similar activity is that the extremely high degree of relevancy of such evidence outweighs the prejudice that may be caused to the defendant. If permitted as an exception when a defendant's life or liberty is at stake, it would seem that "specific act" evidence of similar prior sexual behavior of a victim, where only reputation is at stake, would be a more compelling exception.

In *Evans* v. *United States,* 277 F. 2d 354 (1960), the Court held that where the defense was that killing was necessary to repel a sexual assault and it was clear that the deceased was drunk at the time of killing, it was reversable error to refuse to admit testimony to the effect that the deceased was aggressive when drunk. The defendant and victim were strangers and the proffered testimony was that of the deceased's wife. The Court said:

"We think that, in the circumstances of this case, almost any evidence showing what kind of man the decedent was would be highly relevant in helping the jury to determine whether appellant's story of a sexual assault was truthful, and would therefore serve the interests of justice. * * Finally, but equally important, even if it convincingly appeared that the excluded testimony could not induce the jury to ac-

quit, evidence suggesting that he was the aggressor might well have induced the jury to convict appellant for the lesser included offense of manslaughter, instead of second degree murder."

Some of the specific sexual behavior testimony offered on behalf of Kagebein in chambers was excluded from the jury's consideration because of remoteness, one incident having occurred three years before and another about four years prior to the trial. Based on this record we believe such testimony should not be excluded on the ground it was too remote. There is no fixed standard for determining remoteness. It is necessary for the court to consider all of the circumstances of the case, including the nature of the act. When the prior sexual misbehavior of an adult is relevant to the crime charged, it seems clear that there is a definite relaxation of the remoteness test. *Kerbin* v. *State,* 265 N.E. 2d 22 (Ind., 1970). In *Ward* v. *State,* supra, where appellant was charged with fondling a male child, we approved the jury hearing testimony concerning a prior specific incident of similar unnatural sexual activity and, on the issue of remoteness, said:

"Once it is established that a mature person has developed the proclivity to indulge in unnatural sex acts, we are not prepared or unwilling to say it would be erased by the lapse of 4 or 5 years."

Appellant further contends that it was error for the trial judge to restrict, in the presence of the jury, appellant's cross examination of the officer who obtained Kagebein's confession. Pursuant to Act 489 of 1965 (Ark. Stats. 43-2105), the court held a *Denno* hearing to determine the voluntariness of Kagebein's confession and found that it was voluntarily given. Then the State, as part of its evidence in chief before the jury, called Trooper Nash and introduced the confession. During cross examination, defense counsel asked Nash if he had a court reporter present to take down Kagebein's statement. The trial judge interceded and told defense counsel that he would not be permitted to question the witness on the circumstances surrounding the taking of the

confession, citing Ark. Stats. 43-2105. After objection by defense counsel and a recess, the court ruled that the witness could be recalled and questioned on the credibility of the confession, but not on its admissibility. Cross examination should not have been limited in this manner.

The purpose of our *Denno* hearing statute (Ark. Stats. 43-2105) is to prevent a jury from hearing a confession before the court determines that it has been voluntarily given. It is not intended to restrict evidence a jury may hear after a court determination of voluntariness has been made. The defendant still has the constitutional right to have his case heard on the merits by a jury, including the weight and credibility the jury might give to the voluntariness of the confession. *Walker* v. *State*, 253 Ark. 676, 488 S.W. 2d 40 (1972); *Lego* v. *Twomey*, 404 U.S. 477, 30 L. Ed. 2d 618, 99 S. Ct. 619 (1972).

When defense counsel attempted to interrogate Trooper Nash on the circumstances surrounding his obtaining a confession from the appellant, the trial court commented, in the presence of the jury, that the court had determined in chambers that appellant's confession was voluntary. The factual determination of voluntariness made by a court in a *Denno* hearing should not be disclosed to the jury by either the court or by counsel. *Wigmore on Evidence*, Sec. 861a, n. 35, (Chadbourn Revision, 1970); *United States* v. *Fayette*, 388 F. 2d 728 (1968); *United States* v. *Inman*, 352 F. 2d 954 (1965).

As a further blueprint for the admissibility of testimony in this trial upon remand, we note that Sheriff Gene Garrison was allowed to testify, over objection, that it was his opinion that Wampler's body "had been tortured before anything else happened" because "the body will not bruise after death." Sheriff Garrison was not qualified as a medical expert and the admission of such testimony was improper. *Redd* v. *State*, 63 Ark. 457, 40 S.W. 374 (1897).

One of the court's instructions to the jury told them that voluntary drunkeness was not an excuse for any

crime and that the fact that Kagebein may have been drunk at the time of the alleged crime would not excuse him. The implication of the instruction standing alone as it was is that intoxication can have no effect on the crime of first degree murder. If the testimony upon retrial is sufficient to justify such an instruction, and if requested, the appellant would be entitled to an instruction on diminished capacity as affecting specific intent. *Stevens* v. *State,* 246 Ark. 1200, 441 S.W. 2d 451 (1969); *Pless* v. *State,* 102 Ark. 506 145 S.W. 221 (1912).

The other assignments of error have been considered but need not be discussed because they are not likely to occur again upon retrial.

Reversed and remanded.

FOGLEMAN, J., dissents in part.

HARRIS, C.J., not participating.

JOHN A. FOGLEMAN, Justice, dissenting. I concur in the result and all of the majority opinion, except that part devoted to exclusion of evidence of prior homosexual advances. In spite of the revulsion I feel for these unnatural activities, I cannot agree with either the premise of the majority's holding on this point or its result severely limiting the circuit judge's discretion in the admission of evidence of this nature simply because the matter of the deceased's unnatural sexual activities on the night he was killed had been asserted by appellant.

In order to put the matter in appropriate perspective, I want to emphasize the evidence on behalf of the state as to Wampler's body, the condition in which it was found and the scene of the killing. It was shown that: Wampler's hunting pants and jacket were found in a neat pile (as if they had been taken off and dropped) outside to the right of his pickup truck, his cap on the left side of the truck, and a pair of jockey shorts under the truck seat; Wampler's body was unclothed, except for a pair of boots and a torn piece of ladies' panties on one leg; and a lady's nightgown was lying under, but partially draped over, his head. Wampler was 5′ 11″ tall, weighed 200

pounds and measured 38″ around the waist. It was later shown that a woman with a waistline in excess of 26″ could not comfortably wear the panties and the maximum weight of one who could wear the nightgown would be 150 pounds.

Even assuming that the evidence was sufficient to show an assault by Wampler with intent to commit sodomy or an attempt to do so, there was still no error in the court's refusing to admit the proffered testimony. Appellant offered the testimony of Carroll Ray Bell about an incident that occurred in October or November 1967. He related that, one evening, a man driving a dark-colored Chevrolet truck with white trim and top asked Bell if he wanted a "blow job," and persisted in trying to get Bell, then 17 years of age, to go with him. Bell said he reported the matter to his mother, who, in turn, reported it to the Town Marshal sometime later that night. The Marshal would have testified that, after receiving the report, he circled the neighborhood and saw a maroon and white Chevrolet or GMC pickup truck, the driver of which was trying to talk with a teen-age girl on the sidewalk while driving slowly along beside her. This witness said that he stopped the driver whom he identified as Jimmy Wayne Wampler and summoned him to court on a charge of "Attempting to pick up boys," and required a $25 appearance bond, but suggested that Wampler return and bring cash the next morning when Wampler offered to give a check. The officer said that Wampler came in the next morning and brought the cash for his bond, which he later forfeited.

Appellant also offered the testimony of Bob Brown of Gillett, but the court ruled his testimony inadmissible when he began to tell of an incident that occurred some four years earlier. The judge ruled all this offered testimony inadmissible because it was too remote in time. In a further effort to put the matter in proper perspective, I must emphasize the fact that the trial judge exercised his judicial discretion in ruling the testimony inadmissible because it was too remote.

Where evidence of prior conduct is admissible except for remoteness, the trial court has a discretion in deter-

mining whether it is too remote in time to justify admission. *Caton and Headley* v. *State,* 252 Ark. 420, 479 S.W. 2d 537; *DuVal* v. *State,* 171 Ark. 68, 283 S.W. 23; *Wilson* v. *State,* 184 Ark. 119, 41 S.W. 2d 764.

Further, assuming for the moment that the rules governing evidence of similar conduct to that for which a defendant is on trial are applicable, there was no reversible error on this point. We classified many of the facets of these rules in *Alford* v. *State,* 223 Ark. 330, 266 S.W. 2d 804, and have used that opinion for a guideline ever since. There we noted, in dictum, that where the charge on trial involved unnatural sex acts, proof of prior similar offenses *has been received,* not to show that the accused is a criminal, but that he has a "depraved sexual instinct." The court did not say that such evidence must be, or should be, received. We did not say, and have not said, nor do I know of any other court that has said, that remoteness in time is not a factor to be considered in determining admissibility of such testimony.

An examination of our authorities on the subject of admissibility of previous unnatural sex incidents, in a trial where the defendant is charged with such an act, discloses that remoteness is, indeed, a factor to be considered. The cases relied upon for the classification made in *Alford* clearly state the significance of the element of remoteness. The decision in *Hummel* v. *State,* 210 Ark. 471, 196 S.W. 2d 594, was based entirely on the following quotation from *Hearn* v. *State,* 206 Ark. 206, 174 S.W. 2d 452:

> This court has repeatedly recognized and declared that the evidence of other crimes, recent in point of time, and of a similar nature to the offense then being tried, is admissible as bearing on the question of intent. Some such cases are: Puckett v. State, 194 Ark. 449, 108 S.W. 2d 468; Lewis v. State, 202 Ark. 6, 148 S.W. 2d 668; Monk v. State, 130 Ark. 358, 197 S.W. 580; Cain v. State, 149 Ark. 616, 233 S.W. 779. These cases involved such offenses as robbery, larceny, homicide, or operating a gambling house. We perceive no good reason why the same rule should not apply to sex crimes; in fact, courts of other states have held that, in sex crimes, evidence of other

acts of a similar nature, *recent in point of time,* is admissible as bearing on the question of intent. (Emphasis mine.)

In *Hummel* the time lapse was six months. In *Hearn,* it was two months.

In *Roach* v. *State,* 222 Ark. 738, 262 S.W. 2d 647 in holding that particular evidence of similar conduct with other minors was admissible where the charge was contributing to the delinquency of a minor, we relied on other cases, saying:

> Moreover, such testimony was not inadmissible in this case. We so held in Hummel v. State, 210 Ark. 471, 196 S.W. 2d 594, 596, where, under a very similar situation the court said: "This court has repeatedly recognized and declared that the evidence of other crimes, *recent in point of time,* and of a similar nature to the offense then being tried, is admissible as bearing on the question of intent." Also in Gerlach v. State, supra, it was again said [217 Ark. 102, 229 S.W. 2d 37, 40]: "We have frequently held that evidence of other crimes of a similar nature to the one on trial and *recent in point of time* is admissible as bearing upon intent or purpose." (Emphasis mine.)

Later, in *Ward* v. *State,* 236 Ark. 878, 370 S.W. 2d 425, we considered the question of remoteness. We there said that the question of remoteness had not been raised, but might be on a second appeal. We recognized the general rule that such testimony must not be too remote, but said that a case of that kind (fondling a male child under 14 years of age) was not, in all respects governed by the general rule. We were unwilling to say that, once it is established that a mature person had developed the proclivity to indulge in unnatural sex acts, it *would* be erased by the lapse of four or five years. It must be remembered that, in *Ward,* the evidence had been admitted. We did not say that the trial court should not consider the question of remoteness or that a period of four to five years might not be too remote. Nor did we say that the incidents were, as a matter of law, not too remote. The effect of the decision is simply to hold that the incidents were not, as a matter of law, too remote.

Authorities from other jurisdictions do not lend full support to the majority's statement, or eliminate the time factor. While *Kerlin* v. *State*, 265 N.E. 2d 22 (Ind. 1970), may appear to support the majority position, it is not at all clear that the question of remoteness was considered in that case. The court did not discuss it at all, and the decision actually turned upon the distinction between cases where a "depraved sexual instinct" was involved and the usual case where evidence of prior offenses by the accused is inadmissible to show that a defendant's character is bad or that he has a tendency to commit certain types of crimes. The Indiana court followed the rule of *Lovely* v. *United States*, 169 F. 2d 386 (4th Cir. 1948), cert. denied, 338 U.S. 834, 70 S. Ct. 38, 94 L. Ed. 508 (1949), the case used in *Alford* to rationalize the *Hummel-Roach* category of the "unnatural sex act" exception from the general rule excluding evidence of prior offenses. Yet, as pointed out above, the importance of the relationship in time was recognized in both of these cases. I do not take *Evans* v. *United States*, 277 F. 2d 354, 1 A.L.R. 3d 566 (1960), a 2-1 decision of the District of Columbia Court of Appeals, to be totally in harmony with our own decisions. The evidence actually rejected there had nothing to do with the deceased's sexual proclivities. It merely related to his nature when drunk. The *Evans* language quoted in the majority opinion seems to justify the admission of any kind of evidence to show "what kind of man the decedent was." This is the antithesis of our own rules of evidence.[1] Even so, the *Evans* court found that the rejected proffer, inartfully stated, should be broadly construed as an effort to explain the deceased's *general character and reputation*. We rejected very similar evidence in *Stout* v. *State*, 244 Ark. 676, 426 S.W. 2d 800, saying:

> Ed Baker was foreman at a plant where Jones was at one time employed. If permitted, he would have testified that Jones was discharged by Baker because he was intoxicated on the job, was "loud and belligerent, rude and very disrespectful." There was evidence to the effect that decedent was intoxicated

---

[1]As recently as *Sanders* v. *State*, 245 Ark. 321, 432 S.W. 2d 467, a second degree murder case, we rejected an assignment of error based upon the trial court's rejection of testimony concerning the homicide victim's prior specific acts of aggression and misconduct toward *others* to show his violent nature, saying that this could properly be shown only by proof of general reputation.

when he was shot and that he was belligerent. Appellant contends that Jones' acts of belligerency at the time he was discharged would tend to show that drunkenness always brought on belligerency on the part of Jones. To establish such a pattern of conduct by a single prior act is too illogical to require comment.

Multiplying the incident by two would certainly not have affected the rule.

The majority seeks to equate this situation with that arising in self-defense cases when the question turns upon determination whether the accused or the deceased was the aggressor. This analogy would not require the admission of the testimony offered in this case. Of course, in such cases, evidence of previous difficulties *between the two parties* involved is admissible, unless too remote in point of time. *Crews v. State,* 179 Ark. 94, 14 S.W. 2d 261; *Ross v. State,* 181 Ark. 331, 25 S.W. 2d 769. So is evidence of previous threats made to the defendant by the deceased. *Bell v. State,* 69 Ark. 148, 61 S.W. 918, 86 Am. St. Rep. 188. Likewise, even uncommunicated threats are admissible, if there is any evidence of self-defense, but not if too remote in time to have any bearing on the question or to afford any reasonable presumption or inference of connection between the occasion when the threats were made and the difficulty under investigation. *Crews v. State,* supra; *Parsley v. State,* 151 Ark. 246, 235 S.W. 797; *Brown v. State,* 55 Ark. 593, 18 S.W. 1051. See 5 Ark. L. Rev. 207. On the other hand, it is not competent in such cases to show the violent and dangerous character of the deceased by evidence of isolated facts or particular acts, at least if they were not known to the accused at the time of his alleged offense. *Baxter v. State,* 227 Ark. 215, 298 S.W. 2d 47; *Taylor v. State,* 222 Ark. 491, 261 S.W. 2d 401; *Montague v. State,* 213 Ark. 575, 211 S.W. 2d 879; *Edwards v. State,* 208 Ark. 231, 185 S.W. 2d 556; *Day v. State,* 185 Ark. 710, 49 S.W. 2d 380.

The "self-defense" analogy seems to lend little support to a declaration of error here. Even if it could be said that through this analogy, the proffered testimony might have been admitted, there still remains the question

whether the incidents were too remote in time, on which the discretion of the trial court is subject to reversal only for manifest abuse.

I cannot agree with the majority that the issue of homosexuality was before the jury only through the evidence offered by the state, or that the state introduced evidence making this testimony admissible. The testimony of the dress shop owner certainly did not mention homosexuality. The officers had described Wampler's body and its condition when they found it where Kagebein's companions told them it would be. This description revealed that neither of the feminine garments was positioned on the body as it would have been worn. The panties were on one leg and the gown was under the head and draped over it so that it was over the bullet wound that caused death. It is significant that there was no bullet hole in the gown. As indicated in the majority opinion, attempted inquiries addressed to jurors on voir dire by defense attorneys were the first mention of homosexuality. At that time, appellant's attorneys categorically stated that they anticipated that there would be evidence of homosexuality. The opening statement on behalf of the defendant certainly raised the issue in very explicit terms, saying that the evidence would show that Wampler had oral copulation with three of the boys. During Trooper Stracener's testimony, he was cross-examined as to whether the gown could have been pulled up from the body over the head. This question and other cross-examination were clearly directed toward casting an inference that both the gown and panties were on the Wampler body at the time the officers saw it as if he were wearing them. The testimony tending to show that he could not have worn them did not, in my opinion, open the question of homosexuality. It merely tended to sustain the state's theory that the defendant and his associates stripped Wampler, attempted to put the panties on him and left the nightgown he could not have worn over his face. It certainly did not invite the testimony about the prior incidents, or change the manner in which it should be treated, either in the trial or appellate court. It certainly did show that it was highly unlikely that Wampler was wearing the gown when he was shot.

The majority has overlooked the fact that the state has the right to and did show every circumstance surrounding the encounter in order to show the motive for the killing, and that, while the state is not required to show motive, in order to establish guilt, the absence of motive is a circumstance to be considered with other facts in determining guilt or innocence. *Hogue* v. *State,* 93 Ark. 316, 124 S.W. 783, 130 S.W. 167. The inability of Wampler to wear the garment draped over him, considered along with the fact that items of his personal property were missing and found in the possession of those who fatally assaulted him, certainly tended to show a robbery motive. This evidence was admissible, where self-defense was pleaded, to show, along with other facts and circumstances, intent, malice, deliberation and premeditation by showing the manner of the assault, the nature and location of the wound, the way the weapon inflicting it was used and other circumstances tending to reveal the state of mind of the person or persons inflicting the mortal wound. *Nunley* v. *State,* 223 Ark. 838, 270 S.W. 2d 904; *Ward* v. *State,* 208 Ark. 602, 186 S.W. 2d 950; *Grays* v. *State,* 219 Ark. 367, 242 S.W. 2d 701; *House* v. *State,* 230 Ark. 622, 324 S.W. 2d 112; *Jenkins* v. *State,* 222 Ark. 511, 261 S.W. 2d 784; *Bramlett* v. *State,* 202 Ark. 1165, 156 S.W. 2d 226; *Cheney* v. *State,* 205 Ark. 1049, 172 S.W. 2d 427. The evidence tending to show that Wampler was not wearing the feminine garments when shot and that they were placed on or over him thereafter certainly was a circumstance tending to show malice by showing the abandoned and malignant disposition of the killer. *Carson* v. *State,* 217 Ark. 658, 232 S.W. 2d 835. In short, the state had a right to show anything that occurred between the parties and to show the mental attitude of the accused at the time. *Brown* v. *State,* 149 Ark. 588, 233 S.W. 762. The only way in which the mental attitude of the accused at the time of a killing can be judged is by the attendant circumstances, and broad latitude must be allowed in introduction of testimony bearing upon motive. *Bly* v. *State,* 213 Ark. 859, 214 S.W. 2d 77; *Higdon* v. *State,* 213 Ark. 881, 213 S.W. 2d 621. The evidence had a real bearing on the degree of the crime. *Smith* v. *State,* 230 Ark. 634, 324 S.W. 2d 341. It was admissible to show the inference deducible from the physical circumstances as to the manner in which Wampler came to his death. *Rus-*

*sell* v. *State,* 148 Ark. 654, 227 S.W. 775; *Houston* v. *State,* 165 Ark. 294, 264 S.W. 869.

Furthermore, the state necessarily relied upon circumstantial evidence alone for proof of material elements of the charge of first degree murder. In this situation, it was incumbent upon the state to introduce evidence tending to negate other reasonable hypotheses, and every fact tending to shed light on the issues was admissible and to be given proper consideration. *Phillips* v. *State,* 241 Ark. 601, 408 S.W. 2d 883; *Taylor* v. *State,* 211 Ark. 1014, 204 S.W. 2d 379; *Bowie* v. *State,* 185 Ark. 834, 49 S.W. 2d 1049, 83 A.L.R. 426.

Clearly, this testimony could not be taken to have been introduced for the purpose of, or to have resulted in, introduction of homosexuality as an issue. Certainly it did not invite the introduction of evidence of prior conduct of the deceased independent of any relationships to or with Kagebein or his associates, and totally unknown to them, which would have otherwise been inadmissible.

Although I am unwilling to join in an overextension of a rather unusual exception to the rule against admitting evidence or prior bad conduct by eliminating the trial court's discretion in determining whether the acts are too remote in time, I would reverse and remand for a new trial on the other grounds stated in the majority opinion.